**BOONE COUNTY RURAL ELECTRIC MEMBERSHIP CORPORATION,**
Appellant–Defendant,

v.

**Martha A. LAYTON, Randy Layton, Individually and d/b/a Layton Dairy, Appellees–Plaintiffs.**

No. 12A04–9408–CV–305.

Court of Appeals of Indiana.

March 26, 1996.

Transfer Denied Sept. 18, 1996.

Peter L. Obremskey, Carol Sparks Drake, Parr Richey Obremskey & Morton, Lebanon, for Appellant.

Karl L. Mulvaney, Nana Quay–Smith, Patrick A. Elward, Bingham Summers Welsh & Spilman, Indianapolis, for Appellees.

## OPINION

CHEZEM, Judge.

### Case Summary

Defendant–Appellant, Boone County Rural Electric Membership Corporation ("REMC") appeals from a judgment entered in favor of Plaintiffs–Appellees, Martha Layton, Randy Layton, Danny Layton, and Layton Dairy (collectively, the "Laytons"). We affirm.

### Issues

The parties present three issues which we consolidate and restate as:

I. Whether the Indiana Comparative Fault Act requires the trial court in a bench trial to enter a specific calculation based upon the formula used by juries when allocating fault; and

II. Whether the amount of damages was properly calculated.

### Facts and Procedural History

The facts favorable to the judgment are that Danny Layton began the Serum dairy parlor in 1986. The following year, Danny's father, Johnny Layton, bought a larger farm, called Bennington, in order to increase the Laytons' dairy operation. In March of 1989, the Laytons installed a dairy parlor at Bennington. That June, REMC came to Bennington, approved the wiring from its lines to the dairy barn, and approved the barn's electrical system.

At that time, REMC made no mention of the potential for, or danger of, stray voltage to livestock. Stray voltage is more likely at the end of an electrical line, when a line has loose splices, when there are inadequate grounding rods, and when dairy equipment is turned on—all of which factors were present at Bennington. Cows are much more susceptible to stray voltage than humans. Stray voltage can cause cows to climb out of stalls, to hump their backs, to refuse to drink or eat for fear of being shocked, to refuse to enter the milking parlor unless prodded, to jump, to kick off their milkers, to produce less milk, etc. It also can result in clinical mastitis, a disease which requires antibiotic treatment (which necessitates disposal of milk), and can require that a cow be sent to slaughter so as not to infect the rest of the herd.

In August of 1989, new milking equipment was installed at Bennington, and the Serum dairy operation was transferred to Bennington. However, at Bennington, milk production was down and behavioral problems in the cows began to surface. The Laytons first tried altering the herd's diet, but to no avail. Mastitis became a major problem in their herd. In late December of 1989, a neighbor told them about stray voltage and how to measure for it. The Laytons' measurement revealed the presence of stray voltage at Bennington. They immediately informed REMC of the problem. After grounding all metal parts in the dairy and installing a Ronk Blocker, the stray voltage problem appeared to be under control. Unfortunately, by then, at least 75% of the herd had clinical mastitis. Because of the low cure rate, the risk of infecting replacement cows, and the high cost of treatment, the Laytons took their veterinarian's advice and sent the entire herd to slaughter.

The Laytons started over with the purchase of a new herd. No stray voltage problems were present from January of 1990 through May of 1991 at which time a security light on an electric pole burned out. REMC arrived to replace the light. That evening, Danny Layton received a shock while in the milking parlor. Upon attaining a reading of stray voltage, he called REMC to investigate. After approximately one week, REMC determined that the installation of the new security light had circumvented the Ronk Blocker and negated its protection to the dairy. As before, the herd's behavior changed and mastitis became a problem. Treatment of the animals was performed. Some had to be slaughtered.

Even after this latest stray voltage was rectified, behavioral problems in the cows remained. The Laytons eventually sold the second herd as well as the dairy equipment to satisfy a bank loan. The Laytons filed a multi-count complaint against REMC. After the trial judge dismissed two of the claims, claims for negligence, strict liability, and punitive damages remained. In its extensive findings of fact, conclusions thereon and judgment, the trial judge held in favor of the Laytons, although no punitive damages were awarded. REMC appeals.

### Discussion and Decision

#### Standard of Review

Because this was a bench trial and the court made findings of fact and conclusions of law, we will not set aside the findings or judgment unless they are clearly erroneous. Ind. Trial Rule 52(A); *Hunt v. State,* 564 N.E.2d 568, 569 (Ind.Ct.App.1990), *trans. denied.* In determining whether the findings and judgment are clearly erroneous, we will

neither reweigh the evidence nor judge the credibility of witnesses. *Id.* We consider only the evidence in the record which supports the judgment along with the reasonable inferences which can be drawn therefrom. *Id.* We will disturb the trial court's findings only if the record is devoid of facts or inferences supporting the findings. *Id.*

## I. Negligence and Comparative Fault

REMC asserts that "the recovery awarded must have been based upon strict product liability and not negligence because no specific findings or allocations were made concerning the parties' comparative fault." It bases this assertion on the fact that the Indiana Comparative Fault Act, Ind.Code Sec. 34–4–33–1 *et seq.*, does not apply in strict liability cases, but does apply in fault based cases. *Perdue Farms, Inc. v. Pryor*, 646 N.E.2d 715, 721 n. 4 (Ind.Ct.App.1995), *reh. denied.* In the alternative, REMC claims that if the judgment was based on negligence, the failure to make a fault allocation finding constitutes reversible error.

■ We first address the issue of whether the judgment was based upon a theory of negligence. "A plaintiff can recover for negligence only if he or she establishes that the defendant breached a duty owed to the plaintiff, and that the defendant's breach was the proximate cause of the plaintiff's injuries." *Butler v. City of Indianapolis*, 653 N.E.2d 501, 502 (Ind.Ct.App.1995). Negligence was specifically and extensively argued by the parties. In response, the trial judge made the following specific findings:

41. Boone REMC had a duty to provide reasonable care in providing electricity to the Laytons at the Bennington Farm.

42. Boone REMC breached that duty by failing to use reasonable care in allowing excess stray voltage on the secondary neutral line at the Bennington Farm.

48. The excess stray voltage at the Bennington Farm from August 8, 1989, to January 3, 1990, and from May 22, 1991, to May 27, 1991, at cow contact points:

a. Adversely affected the cows' behavior.

b. Caused increased somatic cell counts in the milk.

c. Caused inordinate instances of mastitis.

d. Caused decreased milk production.

e. Caused excessive culling of the herd.

49. As a proximate result of the negligence of Boone REMC the Laytons suffered damages including:

a. Lost milk production.

b. Losses due to excessive culling.

c. Increased transportation costs due to excessive culling.

d. Losses due to excessive veterinarian expenses.

(R. 456–57). These detailed findings regarding the elements of negligence indicate that the trial judge based his judgment—at least in part—on negligence. Accordingly, we disagree with REMC's argument to the contrary.

■ Having found that the judgment was based on negligence, we next address whether reversible error was committed when the trial judge chose not to include a finding explicitly stating the fault allocation in percentage terms. We find no reversible error and explain our reasoning below.

■ The Comparative Fault Act (the "Act"), which became effective January 1, 1985, "provides a scheme for allocating liability among persons whose negligence has contributed to an injury." *Templin v. Fobes*, 617 N.E.2d 541, 544 (Ind.1993). "The primary objective of the Act is not to achieve proportional liability but to modify the harsh common law rule of contributory negligence." *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.E.2d 669, 672 (Ind. 1991). Requiring jurors to determine the percentages of fault and total damages also ensures that jurors know the effects of their determinations. The hope was that jurors would thereby be better able to fulfill their fact finding function. Edgar W. Bayliff[1],

---

1. Mr. Bayliff was the primary drafter of the Indiana Comparative Fault Act. 17 Ind.L.Rev. 863, 863 n.*.

*Drafting and Legislation of Comparative Fault Act,* 17 Ind.L.Rev. 863, 872, and 872 n. 48 (1984).

In furtherance of the objectives, the Act establishes a *mechanism* by which the fact finder is required to specifically determine the relative degree of the plaintiff's fault with respect to others. *This proportional allocation of fault is the means by which the Act's objectives are reached, not the ends to which it aspires.*

*Bowles v. Tatom,* 546 N.E.2d 1188, 1190 (Ind. 1989) (emphases added). The mechanism is outlined in Ind.Code § 34–4–33–5(a) and (b) in the form of what the jury instructions should say:

(1) The jury shall determine the percentage of fault of the claimant, of the defendant, and of any person who is a nonparty.... In assessing percentage of fault, the jury shall consider the fault of all persons who caused or contributed to cause the alleged injury, death, or damage to property, tangible or intangible, regardless of whether the person was or could have been named as a party. The percentage of fault of parties to the action may total less than one hundred percent (100%) if the jury finds that fault contributing to cause the claimant's loss has also come from a nonparty or nonparties.

\*   \*   \*   \*   \*   \*

(3) If the percentage of fault of the claimant is not greater than fifty percent (50%) of the total fault, the jury then shall determine the total amount of damages the claimant would be entitled to recover if contributory fault were disregarded.

(4) The jury next shall multiply the percentage of fault of the defendant by the amount of damages determined under subdivision (3) and shall then enter a verdict for the claimant in the amount of the product of that multiplication.

Ind.Code § 34–4–33–5(a).[2]

■ As for bench trials, the Act states, "in an action based on fault that is tried by the court without a jury, the court shall make its award of damages according to the principles specified in subsections (a) and (b) for juries." Ind.Code § 34–4–33–5(c); *Cornell Harbison Excavating, Inc. v. May,* 546 N.E.2d 1186, 1188, n. 1 (Ind.1989). Notably, the Act does not require trial judges to do exactly as juries do in fault cases. Instead, the Act states that judges shall make their awards "according to the principles" contained in Ind.Code § 34–4–33–5(a) and (b). Further, Ind.Code § 34–4–33–6, the section which mandates a verdict form with percentages of fault and amounts assigned to each party, "necessarily applies only to jury trials." *See Cornell,* 546 N.E.2d at 1188 n. 1.

Therefore, there is some distinction between comparative fault cases tried to a jury and those tried to a judge. Although it did not specifically address this difference, our supreme court has stated:

We acknowledge that the statutory scheme of the Comparative Fault Act requires that several verdict forms be given to the jury. We view this as an attempt by the legislature to prescribe a procedure by which the jury might be guided through the process of determining fault and assessing damages, and we do not intend to discourage the use of these forms in assisting the jury to properly determine fault and award damages in controversies tried under the Comparative Fault Act.

*State, Through Highway Dept. v. Snyder,* 594 N.E.2d 783, 786 (Ind.1992). Thus, *Snyder* touched on the concept that the Act's procedure for determining fault is a helpful guide for juries trying to apply the Act. Because presumably most jurors do not deal on a routine basis with concepts such as comparative fault, Ind.Code § 34–4–33–5 provides a roadmap of sorts to lead them through their task.

■ In contrast, we presume the trial courts know and will follow the law. *Scott v. State,* 632 N.E.2d 761, 768 (Ind.Ct.App.1994). Applying that rule here, we presume the trial judge is aware of comparative fault principles. Further, REMC discussed comparative fault in its brief. Moreover, we note that Judge O'Neill has presided over compar-

---

2. Ind.Code § 34–4–33–5(b), which provides guidelines for when an action based on fault is brought against two or more defendants, is not relevant for our purposes.

ative fault cases in the past and has entered judgment on verdicts which assigned various percentages of fault to various parties. *See, e.g., Handrow v. Cox,* 575 N.E.2d 611 (Ind. 1991); *Compton v. Pletch,* 580 N.E.2d 664 (Ind.1991). However, *Handrow* and *Compton* differ from the present case in that in those two cases, each party was found to have been at fault to some degree.

■ REMC alleged that it "presented evidence as to the Laytons' contributory fault, such as Laytons' improper construction of their milking parlor, failure to properly treat the herd's mastitis problem when it first appeared, and failure to adequately care for the herd." In addition, REMC's amended answer to the Laytons' complaint asserted, *inter alia,* that the Laytons failed to inform REMC in a timely manner of the electrical voltage shocks. In its judgment, the trial court made numerous findings addressing REMC's allegations:

a. The dairy equipment was installed with the help of an expert. (Finding 7).

b. When the Laytons requested electric service from REMC, Mr. Carl Taylor of REMC inspected and found the service checked out satisfactorily. (Findings 9 and 10).

c. The Laytons did not become aware of stray voltage until December 1989. (Finding 13).

d. When the Laytons immediately noted unusual behavior of the cows during milking at the new farm, they investigated the feed program. (Findings 16 and 17).

e. In November 1989, the Laytons herd began experiencing a greater level of mastitis which was treated medically, yet in some cases lead to culling from the herd. (Finding 18).

f. After learning from a neighbor that stray voltage might be the culprit and then taking a measurement which indicated the presence of stray voltage, Danny Layton immediately reported the findings to REMC. (Findings 19, 20, and 21).

g. When Mr. Taylor suggested connecting all contact points in the dairy to create a "continuous ground," the Laytons did

this yet stray voltage continued to be measured in the barn. (Finding 24).

h. Relying upon their veterinarian's advice concerning the mastitis then present in 75% of the herd, the Laytons decided to sell that herd and start over with a second herd. (Finding 29).

i. One evening after REMC installed a security light at the Laytons' farm, Danny Layton received a shock in the milking parlor. (Findings 32 and 33).

j. The Laytons then noticed problems with the new herd, and as a result, requested that the security light be removed. (Findings 33 and 34).

k. The Laytons are honest, hardworking people who testified truthfully at trial. (Finding 38).

The aforementioned findings all lead to the conclusion that although the judge was faced with conflicting evidence regarding the potential comparative negligence of the Laytons, he found no fault in the Laytons' handling of the situation. The judge was simply unpersuaded by REMC's view that the Laytons' conduct was negligent or unreasonable. It is not our job to reweigh the evidence where there is substantial support for the findings.

REMC cites *Walters v. Dean,* 497 N.E.2d 247 (Ind.Ct.App.1986) for the proposition that the lack of explicit numerical allocation is reversible error. In *Walters,* a case addressing nonparty fault under the Act, "the trial court's original judgment ... merely found for the defendant and that the plaintiff take nothing by his action." *Id.* at 251. When prompted by a motion to correct errors, the trial court issued a ruling stating, "[t]he Court did consider the comparative fault of the parties. Since the plaintiff was 100% at fault, defendant isn't liable." *Id.* at 252. A panel of this court stated that the original judgment was erroneous and not in compliance with the Act, yet ultimately affirmed the judgment on different grounds.

■ Unlike the original judgment in *Walters,* the judgment in the present case went far beyond merely finding for one party and stating that the other would take nothing. Having been presented with numerous vol-

umes of evidence as well as proposed findings by each party, the trial judge took four months to review the materials, and then produced extremely detailed, comprehensive findings and conclusions. That the trial judge did not include a finding explicitly stating that the Laytons were 0% at fault does not concern us where, as here, the judge made extensive findings which imputed no fault whatsoever on the Laytons. The fact is the judge did allocate fault; he simply did not phrase it in terms of 100% fault to REMC and 0% to the Laytons. We are again reminded that the proportional allocation of fault is the means by which the Act's objectives are reached, not the ends to which it aspires. *Bowles,* 546 N.E.2d at 1190. Given these facts, we hold that no error—let alone reversible error—occurred. *See Bob Schwartz Ford, Inc. v. Dunham,* 631 N.E.2d 953 (Ind.Ct.App.1994) ("Reversible error necessarily entails more than merely noting that an error in the proceedings occurred without any representation as to resulting harm.").[3]

Having concluded that no reversible error was presented here, we do point out that it would have been even more clear for the trial judge to have explicitly stated along with his other findings that: 100% fault is allocated to REMC and 0% to the Laytons. While it may have seemed obvious from the findings and the damages that this was the case, a numerical breakdown would eliminate any alleged uncertainty.

## II. Damages

■ REMC also asserts that the trial court's award of damages was "excessive and unsupportable." Specifically, REMC takes issue with the calculation of lost milk production which it claims was inappropriately assessed using gross rather than net profits. Again, we disagree.

■ Keeping in mind the deferential standard of review for evaluating findings,[4] we also add that a judgment is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption or some other improper element. *Eden United, Inc. v. Short,* 653 N.E.2d 126 (Ind.Ct.App.1995), *reh. denied.* Further, all doubts and uncertainties as to the proof of the exact measure of damages must be resolved against the defendant because the most elementary conception of justice and public policy requires that the wrongdoer bear the risk of uncertainty which his own wrong has created. *Id.* A court may, in its discretion, award damages in excess of what the parties request, if the evidence merits it. *Indiana Motorcycle Assoc. v. Hudson,* 399 N.E.2d 775, 778–79 (Ind. Ct.App.1980). We must presume that the trial court considered all of the evidence in reaching its decision. *Benda v. Benda,* 553 N.E.2d 159 (Ind.Ct.App.1990), *trans. denied.*

■ Having found that the expert's testimony was not always credible, the trial court did not adopt all of the Laytons' expert's calculations. A trial court is not bound by expert testimony. *Plummer & Co., Inc. v. Cole,* 613 N.E.2d 481 (Ind.Ct.App.1993). As long as there is lay testimony, other evidence or other inferences in the record, a reviewing court will not reweigh the evidence and assess witness credibility.

There was evidence that but for the stray voltage, the Laytons would have built a herd of 90 milking cows, producing an average of 64 pounds per day, and that this level was reached in October of 1989. Because the expected milk production was attainable with the same size herd of cows the Laytons had already acquired, no additional costs would have been incurred in producing milk at full capacity. The feed was already present on the 120 acres of land at Bennington. Likewise, the salaried labor was already there and would not be paid more for additional work. (See Finding 64). Veterinarian bills could be less than when the cows were being treated for mastitis. Accordingly, the trial court's damages award was not based on prejudice, passion, partiality, corruption or

---

3. Because of our resolution of the Comparative Fault issue, we need not address the parties' issue of whether the damage was "sudden and major" within the meaning of Indiana's Strict Products Liability Act.

4. *See supra,* pp. 737 and 738.

some other improper element; instead, the finding that there was no need to subtract additional marginal or variable costs because none were incurred, was supported by the above evidence and inferences. As such, we cannot second guess the trial judge's decision.

Affirmed.

DARDEN and ROBERTSON, JJ., concur.