Ralph S. MAJOR, Jr., Appellant–
Plaintiff,

v.

OEC–DIASONICS, INC.,
Appellee–Defendant.

No. 50A03–9910–CV–392.

Court of Appeals of Indiana.

Jan. 18, 2001.

Henry J. Price, William C. Potter II, Audrey M. Bougard, Price, Potter, Jackson & Mellowitz, P.C., Indianapolis, IN, Attorneys for Appellant.

Robert W. Mysliwiec, South Bend, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ralph Major, Jr. appeals the trial court's order foreclosing the attorney fee lien of the firm of Jones, Obenchain, Ford, Pankow, and Lewis ("the Firm"[1]) in the amount of $970,261.75 against the $3,138,118.00 judgment won by Major in *Major v. OEC–Diasonics, Inc.,*[2] and the Firm cross appeals.

We affirm.

### ISSUES

Major contends that the order must be reversed because:

1. The equitable doctrine of "unclean hands" prohibits an award of any attorney's fees here.

2. A violation of the Rules of Professional Conduct requires the disgorgement of attorney's fees in this case.

---

1. In referencing the Firm, we refer to the legal entity of Jones, Obenchain, Ford, Pankow, and Lewis, of which Robert Mysliwiec was a partner.

2. Major's motion to accept his supplemental record of proceedings is hereby granted.

3. Major failed to comply with the mandate of Indiana Appellate Rule 8.3(A)(5), which requires an appellant to provide a statement of facts that summarizes the facts in a light most favorable to the judgment. *See County Line Towing v. Cincinnati Ins.,* 714 N.E.2d 285, 289 (Ind.Ct.App.1999), *trans. denied.* Compliance with the rule does not "burden" us, as he suggests in explaining why he has declined to observe the rule. Major's Brief at 5, n. 2.

3. The Firm's maximum recovery must be limited to a reasonable hourly rate.

4. Judicial testimony was erroneously admitted.

5. The trial court erroneously denied Major's motion for findings of fact and conclusions of law.

The Firm's issues on cross appeal are:

1. Whether testimony by the Dean of the Indiana University School of Law—Indianapolis was erroneously admitted.

2. Whether the Firm's motion to dismiss the appeal was erroneously denied.

### FACTS[3]

The facts favorable to the judgment indicate that in 1969 Major negotiated a 30–year contract to sell orthopedic devices for a company that subsequently became two companies: OEC–Diasonics and Biomet. On January 30, 1986, OEC wrote Major a letter terminating his contract. In early February of 1986, Major discussed with Robert Mysliwiec, a partner in the Firm, representing him to contest the termination as a breach of the contract. At that time, Mysliwiec was already representing Major in a breach of contract action against Biomet involving the same contract. In June of 1986, Mysliwiec agreed to undertake the representation on a contingency fee basis for ⅓ the gross recovery, with Major to pay out of pocket expenses, and Major agreed.[4] However, there was

---

Rather, we are burdened by the lack of such a statement—particularly when the record before us consists of 28 volumes.

4. The dissent cites the trial court's finding that the parties had agreed *in 1986* to a 25% contingency fee agreement. The Firm's appellate brief concedes the correctness of Major's appellate argument that no evidence supports the trial court's finding that an oral 25% contingency fee agreement was formed in 1986. Mysliwiec testified that in 1986 the parties had agreed to his representation for "one-third (⅓) of the gross recovery." (R. 4654). However, Major testified that no fee arrangements were discussed in 1986. Without evidence to support an agreement *in 1986* for a a 25% contingency fee agreement, we

no written agreement between the parties to this effect.

Subsequently, in November of 1987, Major asked Mysliwiec to "discount" the OEC fee arrangement because of the fees Mysliwiec was earning on the Biomet matter. (R. 4657). Mysliwiec and Major agreed to a 25% contingency fee arrangement. Later, in 1991, Major decided that he needed additional counsel to (1) "act mean" and "be a bad guy," (2) monitor Mysliwiec, and (3) handle Major's preparation for and examination at trial. (R. 4027). He asked Thomas Lewis, another partner of the Firm, to participate in his representation. Major then offered to increase the Firm's fees to a 30% contingency arrangement. Again, these 1987 and 1991 agreements were oral.

The complaint against OEC had been filed in January of 1988. Discovery was extensive, entailing the review of nearly 100 boxes of documents in Major's possession and more than 12,000 documents from OEC.[5] Three separate summary judgment motions were briefed and argued. One summary judgment ruling changed the focus of the OEC action dramatically, requiring Major to demonstrate that he could not have been terminated for failing to exert his "best efforts" on behalf of OEC. Further, proof of Major's post-termination damages was made more difficult because Major had alienated his former employees, who refused to testify for him, and Major's OEC sales had decreased the year before his termination.

In 1987, Major had indicated a willingness to settle his claim against OEC for a $500,000 net recovery. However, Major subsequently opined that his case was worth at least $5 million. OEC had never offered any settlement, and the mediator had recommended settlement at $1.5 million. Before trial, Mysliwiec advised Major in writing on the legal issues as to liability and damages, and suggested that a "realistic judgment" would likely be in the range of $2 to $2.5 million. (R. 4863).

After a six day trial to the bench, in May of 1992 the court awarded Major a judgment of more than $3 million. Mysliwiec was extremely pleased, but Major believed the amount "was less than one-half of what [he] should have received." (R. 4311).

OEC appealed, and as Mysliwiec began working to defend the judgment, Major hired another counsel for the announced purpose of suing Mysliwiec for malpractice. Pursuant to the instruction of Major's other counsel, Mysliwiec continued to represent Major throughout the course of the appeal.[6] On November 3, 1993, the Court of Appeals reversed the judgment based upon a single issue and entered judgment for OEC. On Major's behalf, Mysliwiec petitioned for transfer. The Indiana Supreme Court accepted transfer, heard oral argument by Mysliwiec, and in 1996 vacated the opinion of the Court of Appeals. This court then considered the other issues raised by OEC on appeal, and we affirmed the original judgment of the trial court on December 23, 1997. Our supreme court denied transfer on this decision on October 30, 1998, and Major's judgment of $3,138,118.00 was intact, having been successfully defended by Mysliwiec three times.

After Major had indicated his intention to bring a malpractice claim in 1993, the Firm had filed their notice of intent to hold an attorney's lien on the judgment, which was later amended in 1998. Thus, after the OEC judgment was final in late 1998, OEC paid the judgment along with ac-

---

cannot agree with the dissent's suggestion that a proper order would be for "judgment equal to" a 25% contingency.

5. More than 400 exhibits were admitted at trial.

6. Major originally paid the Firm slightly more than $25,000 for appellate attorney fees as he was billed for same but then refused to pay any additional fees for the Firm's appellate work. Bills for the balance of that work total more than $90,000.

crued interest, and the funds were placed in escrow.

In a February 1999 hearing on the attorney's lien foreclosure action, the trial court judge, Michael Cook, advised that during the 6½ years that had elapsed since the *Major v. OEC* trial, his brother had been represented by Mysliwiec. Upon Major's request, Judge Cook recused himself. A special judge was then appointed to consider the lien action.[7]

Thereafter, the trial court heard four days of testimony. A salesman for Biomet testified that Mysliwiec was one of the two outstanding attorneys in the country for suing orthopedic device companies on behalf of their salesmen. Mysliwiec testified that during the pendency of the lawsuit, Major forbade his acceptance of work for certain other legal clients, and that his work on Major's case resulted in his going for months at a time without income. Mysliwiec also testified that about two months before trial, Major gave him $10,000. Mysliwiec testified that he believed it was a bonus. Several weeks later, upon Mysliwiec's request, Major gave him another $10,000, which Mysliwiec testified he believed to be an advance against their contingency fee agreement. Mysliwiec also described a time when Major had given the Firm's paralegal working on the Major case a check for $1,000. These three payments were not reported to the Firm.

The trial court heard testimony from Norman Lefstein, Dean of the Indiana University School of Law—Indianapolis. According to Dean Lefstein, Mysliwiec's acceptance of the two $10,000 checks from Major violated Rule 1.8(a) of the Indiana Rules of Professional Conduct.

An experienced local trial attorney testified that a 40% fee would be a reasonable attorney fee in the community for legal services through appeal in this case. The attorney noted the "sheer size of this litigation" and the "mass of paperwork to be reviewed," (R. 5489), how the legal issues changed between the onset of litigation and trial, and the burdens Major imposed on the Firm throughout this "extremely unusual, extremely difficult" case. (R. 5502). The attorney described how evidence showed that Major had pitted his own attorneys against each other and imposed tremendous stress upon Mysliwiec.

The trial court also considered testimony about "what he observed" from a deposition by Judge Michael Cook.[8] (R. 1649). Judge Cook indicated that *Major v. OEC* was "not simply a trial on damages" but involved "a great number of both factual and legal issues." (R. 2708). He praised the extremely "orderly fashion" in which the Firm presented "a mass of information." (R. 2710). He stated that in his more than twenty years on the bench, this was the only case where he awarded more than $1 million. Based upon his observation of the difficult issues involved and the presentation by the Firm, Judge Cook opined that a 40% fee would be reasonable, given "the dollar amount" of the judgment and "going to the Supreme Court." (R. 2747).

Major had requested findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. The trial court initially issued an order awarding attorneys a "reasonable attorney fee" of "$970,261.75 of the Judgment amount of $3,138,118.00," with interest accruing during the period of escrow to be apportioned accordingly. (R. 3795). The order promised "Findings and Conclusions" to "follow at an early date." (R. 3796). Seventeen days later, the trial court issued a 26 page order with 71 findings of fact. It found "no enforceable contract for fee services exist[ed]." (R. 3820). Specifically, the trial court found that the initial 1986 Major/Mysliwiec oral

---

7. This second judge, the special judge, will subsequently be referred to as "the trial court" in our discussion of the order being appealed herein.

8. Judge Cook testified pursuant to a subpoena.

contingency fee agreement had been superseded by a subsequent oral contingency fee agreement, which failed to comply with the requirement of Rule 1.5 of the Indiana Rules of Professional Conduct (effective January 1, 1987) that a contingency fee agreement be in writing and include specified facts. Consequently, the trial court proceeded to determine a reasonable attorney fee in this case "pursuant to principles of *quantum meruit*." *Id.*

The trial court noted that referring "to Major as a difficult client" failed to "adequate[ly] ... describe the special problems involved in his representation," and that Major had substantial past litigation experience. (R. 3807). It further observed that Major had strong opinions about how his case should be handled yet "lacked comprehension of litigation strategy and tactics." *Id.* It also expressly found Major "to not be a particularly credible witness." (R. 3813).[9]

The trial court found "no clear and convincing evidence presented that Mysliwiec attempted to borrow the first payment of $10,000," but found that Mysliwiec's request for "a further $10,000" was "clearly barred and improper." (R. 3818). It found that Mysliwiec had directed the paralegal to keep the $1,000 and not report it to the Firm. The trial court then found "the second $10,000" to constitute "misconduct" that would negatively impact "the award of attorney fees." (R. 3819).

The trial court concluded that a "percentage computation" would "more accurately reflect the value of the services rendered" than the hourly rate urged by Major, as the Firm "ran all of the risks" in the *Major v. OEC* litigation. (R. 3822). Nevertheless, it computed the various scenarios: at the hourly rates,[10] as recommended by Major, $362,279 in total fees would be owed; a 25% fee would net Attorneys $832,490; a 30% fee would net $989,395; a 40% fee would net $1,209,180.[11]

The trial court then determined that "an appropriate fee" would be the hourly rate "and a $650,000 bonus" for the Firm's "achievement." (R. 3823). However, from this sum, the trial court ordered that $63,000—"trebling the $21,000 payments made by Major to Mysliwiec and the paralegal"—be subtracted for "attorney misconduct." (R. 3823). Consequently, after crediting Major for some payments already made toward appellate attorney fees, the trial court ordered the foreclosure of the attorney fee lien in the amount of $970,261.75 plus any accrued interest thereon.

### DECISION

Where, as here, the trial court entered findings of fact and conclusions of law pursuant to a party's request and Indiana Trial Rule 52, we apply a two-tiered standard to review the court's order. *See Oil Supply Co. v. Hires Parts Serv.*, 726 N.E.2d 246, 248 (Ind.2000). We determine whether the evidence supports the findings, and whether the findings support the judgment. *Id.* We do not reweigh the evidence, and we consider only the evidence favorable to the trial court's judgment. *Id.* We do not "set aside the findings or judgment unless clearly erroneous." T.R. 52(A).

As our supreme court explained in *Galanis v. Lyons & Truitt*, 715 N.E.2d 858, 861 (Ind.1999), quantum meruit is an equitable doctrine that prevents unjust enrichment by permitting one to recover the

---

9. We find this finding noteworthy due to the fact that Major's appellate brief relies so extensively on Major's testimony.

10. The Firm's records indicated the number of hours for services that had been provided on the case by its partners, associates, and paralegals.

11. All fee computations are for attorney fees through appeal of the *Major v. OEC* case and would credit Major for (a) the $25,068.25 already paid by Major for appellate attorney fees, and (b) $21,000 (two $10,000 payments to Major and one $1,000 payment to the paralegal).

value of work performed for another, "if valuable." In the case of attorney and client, the value is that of "the benefit the client received" from the attorney's work. *Id.* If the attorney "is not compensated" for the work performed on the client's case that resulted in a recovery for the client, the client is "unjustly enriched." *Id.* at 862. Therefore, there must be a determination of the dollar value of the attorney's services "to offset the unjust enrichment" and "based on the value conferred on the client." *Id.*

## MAJOR'S ISSUES:

### 1. "Unclean Hands"

■ Major first claims that the trial court erred in awarding the Firm the remedy of quantum meruit because quantum meruit is an equitable remedy and the doctrine of "unclean hands" requires that he who seeks equitable relief "must be free of wrongdoing in the matter before the court," citing *Community Care Centers, Inc. v. Sullivan*, 701 N.E.2d 1234, 1242 (Ind.Ct.App.1998), *trans. denied* According to Major, upon noting the violation of the Professional Conduct Rules with respect to written contingency fee agreements and the acceptance of the $21,000 payments from Major, the trial court was required to find the Firm to be "precluded from seeking equitable relief pursuant to the quantum meruit doctrine." Major's Brief at 28. We disagree.

First, our supreme court has expressly rejected the bright line prohibition expressed in Major's assertion. In *City of Rochester v. Campbell*, 184 Ind. 421, 111 N.E. 420, 421 (1916), it held that when a contract for legal services was "invalid" (because it linked the fee for legal services to a recovery amount) but "not illegal either on account of the nature of the service or the circumstances under which it is rendered, the attorney may recover on a quantum meruit notwithstanding the invalidity of the contract under which the services were rendered." 111 N.E. at 421.

■ Second, Major's assertion presupposes that there can be no consideration of the degree or relative amount of activity characterized as constituting "unclean hands" when the trial court determines whether to award equitable relief. We believe that such a consideration is appropriate, inasmuch as the ultimate determination is the value of legal services rendered such that the client is not unjustly enriched. *See Galanis,* 715 N.E.2d at 862. And the trial court appears to have considered the degree and relative amount of the Firm's misconduct as follows:

Any misconduct was by attorney Mysliwiec, who shielded any misconduct from the balance of the law firm. It is clear that [the Firm] had a vast amount of resources committed to this case. While it is generally true that any partner can bind the balance of the partnership, the limits of equity would seem to have some interplay to limit the severity of this application.

Any misconduct occurred after a significant proportion of the trial preparation and work had occurred. The quality of the professional service was in no way [a]ffected. Major was not damaged by the misconduct. Therefore a denial of a substantial attorney fee seems out of all proportion to the wrong.

Major was a participant in the misconduct and probably initiated it by making the first payment. It is troubling to create a precedent that a client can bar his attorney from collecting his attorney fee in a matter by timing an ill-defined gift or bonus or loan to his lawyer. While it is reasonably clear that Major was not intending to do this, creating the precedent of barring payment under such circumstances would be most inappropriate.

(R. 3821). The evidence at trial supports the facts noted above, and the trial court's conclusion of law that these facts do not preclude an award of reasonable attorney fees on a quantum meruit basis is not clearly erroneous.

## 2. *Rule Violations*

Major next asserts that because the trial court found violations of the Rules of Professional Conduct, authority requires that the Firm be ordered to disgorge its fees. He cites *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). *Woods* was a challenge to the bankruptcy court's disallowance of "claims for compensation and reimbursement" by bankruptcy counsel upon "findings of fact" that indicated counsel had "dual or conflicting interests." *Id.* at 263, 264, 61 S.Ct. 493. The court declared, "Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation." *Id.* at 268, 61 S.Ct. 493. Unlike in *Woods,* the trial court expressly found that "[no] conflict of interest existed in the legal sense" between the Firm and Major, and that "their financial interest in the outcome of the case coincided." (R. 3816).

Major also cites *In re Wilson,* 715 N.E.2d 838 (Ind.1999), as requiring disgorgement. *Wilson* was an attorney disciplinary proceeding in which attorney Wilson was found to have not only failed to have a written contingency fee agreement with a client but also (1) failed to provide a written statement to clients indicating (a) the outcome of litigation, (b) the remittance to the clients, and (c) the remittance calculation method; (2) misappropriated escrow funds for his personal use; (3) failed to maintain a sufficient balance in his escrow account to pay his obligations to clients; and (4) inserted a term into a settlement agreement requiring a client to withdraw a grievance filed with the disciplinary commission. Based upon the totality of his misconduct, the attorney was suspended from the practice of law for 1½ years; however, we find no discussion of disgorgement of fees.

Although the trial court did not order a disgorgement of fees, it did significantly reduce the attorney fees awarded based upon the $21,000 in payments. Further, the fees awarded are less than they would have been based upon the agreed 30% contingency fee arrangement and appellate fees. Thus, Major cannot argue that the Firm suffered no penalty for the Rule infractions, and we find no clear error.

## 3. *Limitation to Hourly Rate*

Major argues that the trial court erred in awarding the Firm a $650,000.00 bonus over and above its hourly rates for legal services provided. According to Major, the award "unjustly enriche[d]" the Firm despite "its breaches of Indiana's rules of ethics." Major's Brief at 37. He cites *Galanis* for the proposition . that an award of attorney's fees pursuant to the quantum meruit doctrine may be made only "where there is no fault attributable to the lawyer." *Id.* at 38. He cites *Galanis* as saying that "if there is no fault to be attributed to the lawyer, as seems to be the case here, the measure of the benefit is what is received by the client. . . ." *Id.* However, the citation reads, ". . . if there is no fault to be attributed to *either the client or* the lawyer, as seems to be the case here. . . ." 715 N.E.2d at 862 (emphasis added). As already noted, the trial court did not find Major to be entirely without fault with respect to one of the attorney misconduct matters. Accordingly, Major's argument in this regard fails.

Moreover, consistent with the reasoning in the two foregoing discussions, we cannot agree with Major that the result here sends "a resounding and improper message to the Indiana legal community that it will be *rewarded, by being compensated,* in an amount exceeding the value of its legally unenforceable oral contingency fee 'agreement,' for its breaches of our profession's rules of ethics." Major's Brief at 39 (emphasis in original). Not only does the end result (the amount of the attorney fee lien foreclosed) reflect reductions in the fee from that amount to which the Firm might have been entitled, but the Firm has spent years and significant resources in

litigation that could have been avoided had the Rules been observed.[12]

Finally, as discussed in *Galanis*, "the time expended by the attorney alone is not a controlling factor" in determining the reasonable value of the legal services rendered. 715 N.E.2d at 862. Further, we note that the trial court expressly found that it was the Firm that bore all the risk throughout the twelve years of litigation (from 1986 until 1998), and the "risk of a loss" is a consideration in determining a reasonable attorney fee under quantum meruit. *Id.* In addition, the trial court considered the various factors specified in Professional Conduct Rule 1.5 when determining a reasonable fee here.[13] Accordingly, we find no error in the trial court's judgment for fees in an amount exceeding a simple hourly rate.

### 4. Judicial Testimony

Major next claims that the trial court erred in admitting the deposition testimony of Judge Cook, who presided over the original *Major v. OEC* trial. He cites *Cornett v. Johnson*, 571 N.E.2d 572 (Ind.Ct.App.1991), for the proposition that "a judge who has adjudicated an underlying cause of action" is strictly prohibited "from testifying regarding an attorney's conduct during that cause of action in a subsequent proceeding." Major's Brief at 51.

In *Cornett*, the attorney who had represented a client in a dissolution proceeding was subsequently sued for legal malpractice. The client presented testimony of the dissolution judge to the effect that had certain evidence been presented by the attorney for his client, a different ruling

would have obtained. Our express holding was "that the judge hearing the underlying action should not testify in a subsequent legal malpractice action." 571 N.E.2d at 575. Here, Judge Cook's testimony was not considered in a legal malpractice action.

We presume that the trial court knows and will follow the law. *Boone County Rural Elec. Membership Corp. v. Layton*, 664 N.E.2d 735, 739 (Ind. Ct.App.1996), *trans. denied.* The presumption that the trial court correctly followed the law is one of the strongest presumptions applicable to our consideration of a case on appeal. *Fuehrer v. Fuehrer*, 651 N.E.2d 1171, 1175 (Ind.Ct.App.1995), *trans. denied.* When the trial court ruled to admit the deposition testimony, it indicated it would consider Cook's testimony as to what he observed at trial. We have no reason to believe any inadmissible evidence from the testimony was considered, and we find no error here.

### 5. Denial of Request for Findings of Fact and Conclusions of Law

Finally, Major argues that the trial court erred by failing to grant his motion for findings of fact and conclusions of law pursuant to T.R. 52(A). However, he then asks that we "deem" the subsequent findings of fact and conclusions of law "as having been entered pursuant to T.R. 52(A)." Major's Brief at 55, 56. Having done so, we accordingly find Major to have suffered no prejudice in this regard and consequently find no trial court error here.

### THE FIRM'S ISSUES:

### 1. Dean's Testimony

The Firm contends that the trial court erred in admitting testimony from

---

**12.** The Firm also had to defend against a federal court action brought by Major asserting claims of legal malpractice, breach of fiduciary duty, and criminal deception.

**13.** Specifically, the trial court made findings of fact as to the following factors: the time and labor required; the novelty and difficulty of the questions involved; that acceptance of the particular employment precluded other

employment; customary local fees; the amount involved and the results obtained; the nature and length of the professional relationship with the client; the experience, representation and ability of counsel; and that the parties "proceeded throughout the litigation as if the fee was contingent." (R. 3812—3816, R. 3816).

Norman Lefstein, Dean of the Indiana University School of Law—Indianapolis. According to the Firm, Lefstein improperly testified to the legal conclusions that certain conduct violated the Rules of Professional Conduct.

■■■■ The Firm does not dispute that a foundation established Dean Lefstein's qualifications as an expert witness in the field of legal ethics. Rather, it looks to Indiana Evidence Rule 704(b)'s prohibition of a witness' testifying "to opinions concerning ... legal conclusions." However, we have noted the "trend ... to allow expert opinion testimony even on the ultimate issue of the case, so long as the testimony concerns matters which are not within the common knowledge and experience of ordinary persons and will aid" the trier-of-fact. *Koziol v. Vojvoda,* 662 N.E.2d 985, 991 (Ind.Ct.App.1996). Here, the trial court commented that the Dean's testimony would "be instructive," given his background, but then expressly stated that it would "feel free to ignore him" on a legal conclusion "if I disagree with him because that ultimately is my call." (R. 4398). Given the trial court's broad discretion in the admission of opinion evidence, *see Koziol,* 662 N.E.2d at 990, and the presumption that the trial court followed the law, *see Fuehrer,* 651 N.E.2d at 1175, we find no error here.

### 2. *Denial of Motion to Dismiss*

■■■ Subsequent to the trial court's order of foreclosure, Major's portion of his $3,138.118.00 judgment and accrued interest were released to him from escrow. Consequently, the Firm argues, this court should have dismissed Major's appeal pursuant to Indiana Code 34–56–1–2, which provides that the "party obtaining a judgment shall not take an appeal after receiving any money paid or collected on a judgment."

However, the trial court's order here is effectively a judgment for the Firm. It derived from an action brought by the Firm and followed a trial on the issue of whether the Firm was entitled to attorney fees. The judgment being appealed is not Major's but that of the Firm, which brought the action giving rise to the order in its favor. Because Major was not the "party obtaining the judgment" in this action, we do not find his appeal to be precluded by the statute.

We affirm.

FRIEDLANDER, J., concurs.

KIRSCH, J., dissents with separate opinion.

KIRSCH, Judge, dissenting.

Our supreme court adopted Rule 1.5 of the Rules of Professional Conduct for the protection of clients and the avoidance of misunderstanding and resulting fee disputes. It has held that in the absence of a written contingency fee agreement, an attorney can recover on a quantum meruit basis to avoid unjust enrichment of the client. *Galanis v. Lyons & Truitt,* 715 N.E.2d 858, 862 (Ind.1999). Here, the trial court ordered and the majority affirms a quantum meruit recovery which unjustly enriches the lawyer who failed to reduce his contingency fee agreement to writing in clear violation of the rule. I am troubled that an attorney who breaches the clearly set forth requirement that contingency fee agreements be in writing can, nevertheless, receive a *bonus* nearly tripling what he would have recovered on an hourly rate basis and, thus, recover more on a quantum meruit theory than he would have recovered had the invalid oral fee agreement been valid. As a result, I respectfully dissent.

The trial court found that a 25% contingency fee agreement was entered into prior to January 1, 1987, the effective date of Rule 1.5 which requires that contingency fee agreements between lawyer and client be in writing, and concluded that the contingency fee agreement was, therefore, a

valid contract.[14] It then states that the 1991 oral agreement increasing the contingency fee to 30% was invalid because it was not in writing. I agree with both of these conclusions, but I differ regarding the legal effect of the 1991 oral agreement. The trial court found "clearly the parties were setting aside the first agreement in creating a second agreement" and concluded that "Clearly, ... the parties revoked that contract to make a new one."

What was clear to the trial court is not to me. Nothing in the Record supports the conclusion that the parties either revoked the earlier agreement or manifested an intent to do so. To the contrary, I believe that the parties were simply attempting to modify their earlier agreement to increase the contingency. After Rule 1.5 became effective on January 1, 1987, the 1986 oral contingency agreement could only be modified in writing. Thus, the 1991 oral contingency agreement increasing the contingency was an attempt to modify the prior agreement. It was ineffective to do so because it was not in writing. The fact that it did not effectively modify the earlier agreement, however, does not revoke that agreement. It remained in effect and should determine the outcome of this proceeding. I would reverse the trial court's judgment and remand with instructions to enter judgment equal to the 25% contingency.

I am troubled by the fact that the trial court imposed a sanction of treble damages regarding the $21,000 paid by Majors to Mysliwiec. Our supreme court has exclusive jurisdiction regarding discipline of attorneys. Ind. Appellate Rule 4(A). I believe that by imposing the sanctions for Mysliwiec's misconduct, the trial court im-

properly entered that area that is exclusively reserved to our supreme court.

---

14. The majority states at footnote 4 of the opinion that the parties are in agreement that the trial court's finding that the parties entered into a 25% contingency agreement in June 1986 was in error and notes that Mysliwiec testified that the June 1986 agreement was for a one-third contingency, and Majors testified that there was no contingency fee agreement at all. I believe the evidence clearly supports the trial court's finding that the parties entered into a valid oral contingency agreement prior to January 1, 1987. The evidence also clearly supports the fact that Mysliwiek agreed to reduce the contingency fee to 25% of the recovery. Record, pp. 4667–4669.