Stephen L. and Melinda VAUGHN,
Appellants–Plaintiffs,

v.

DANIELS COMPANY (WEST VIRGINIA) INC., and Solar Sources, Inc., Appellees–Defendants.

No. 14A01–0111–CV–408.

Court of Appeals of Indiana.

Nov. 4, 2002.

1112 

J. Kevin King, Cline King & King, P.C., Columbus, IN, Attorney for Appellants.

Jeffrey W. Ahlers, Todd C. Barsumian, Kahn, Dees, Donovan & Kahn, Evansville, IN, Attorneys for Appellee, Daniels Company (West Virginia), Inc.

R. Steven Johnson, Sacopulos, Johnson & Sacopulos, Terre Haute, IN, Attorney for Appellee, Solar Sources, Inc.

## OPINION

BARNES, Judge.

### Case Summary

This is an appeal from the granting of summary judgment in favor of the Defendants in a suit brought by Stephen Vaughn[1] for injuries he sustained as a result of an accident while installing a pipe

---

1. Vaughn's wife brought a loss of consortium claim against the defendants as well. Because her claim is derivative of Vaughn's, no discussion related to it is included here.

during the construction of a coal plant. We affirm in part and reverse in part.

## Facts

Briefly summarized, the designated facts are that in 1995, Solar Sources, Inc. ("Solar") contracted The Daniels Company ("Daniels") to design, procure, and construct a coal preparation plant. Daniels in turn contracted with Trimble Engineers and Constructors, Inc. ("Trimble"). Trimble was responsible for the construction of the plant, including the assembly of three coal sumps, one of which was a heavy media sump. Daniels prepared the blueprints and specifications for the sump, which was manufactured by a company in West Virginia that is not a party in this case.

Vaughn was employed by Trimble as a pipe fitter. When construction of the plant was approximately halfway complete, Vaughn was injured in an accident, which occurred when two Trimble employees asked Vaughn to assist them in bringing a pipe in for installation on the sump. Vaughn climbed onto the sump, and the pipe was maneuvered through a hole in the wall of the plant with a forklift and raised to the level of the sump. Trimble employees wrapped a chain around the pipe, and the forklift pulled away, leaving the pipe supported by the chain alone. As the men maneuvered the pipe, a bolt that had braced the chain gave way, and the pipe slipped, pulling Vaughn off the sump and throwing him fifteen feet to the floor.[2]

Vaughn had removed his safety belt just prior to climbing onto the sump.

On December 11, 1997, Vaughn filed a complaint for personal injury damages against Daniels and Solar sounding in products liability, negligence, and nuisance.[3] Two years later, Daniels filed a summary judgment motion. In March 2000, Vaughn filed a motion for leave to amend the complaint, which was granted. After a hearing on the summary judgment motion, the trial court entered an order denying the motion except as to the nuisance claim.

In May 2001, Solar filed a motion for summary judgment. Thereafter, Daniels filed a second summary judgment motion. After Vaughn filed responses to both motions, the trial court conducted a hearing. In October, the trial court issued an order granting Daniels' motion for summary judgment, Solar's motion for summary judgment, and Solar's motion to strike a paragraph from an expert's affidavit. Vaughn now appeals.

## Issues

Vaughn raises several issues in his challenge to the entry of summary judgment, which we have reorganized and rephrased as:

I. whether an affidavit designated by him contains inadmissible evidence that should be stricken;

II. whether the trial court erroneously determined that he was not a foreseeable user or consumer of

---

**2.** The coal sump is a conical-shaped tank into which raw coal is fed by a screen and mixed in a solution of water and magnetite in order to pump slurry to a heavy media cyclone where the coal is separated from rejected material. The top of the sump is covered with steel grating, which is two feet below a steel lip that encircles the top of the sump. At the time of Vaughn's fall, he was maneuvering a pipe suspended on a chain into position

for installation when he placed his knee on the steel lip of the sump. When the pipe slipped, he became entwined in the chain, lost his balance, and fell over the side of the tank.

**3.** The Vaughns also named Solar Sources Underground, LLC, as a defendant, but it was granted summary judgment and is not a party to the appeal.

the sump pursuant to the Indiana Products Liability Act (the "Act");

III. whether the trial court erroneously determined that the sump was not defective or unreasonably dangerous under the Act;

IV. whether the trial court erroneously determined that he misused the sump and incurred the risk of injury under the Act; and

V. whether the trial court erroneously determined that Daniels and Solar did not owe or assume a duty toward him.[4]

### Analysis

■ Our analysis proceeds from the premise that summary judgment is a lethal weapon and courts must be ever mindful of its aims and targets and beware of overkill in its use. *Bunch v. Tiwari*, 711 N.E.2d 844, 847 (Ind.Ct.App.1999). We analyze the issues, however, in the same way as a trial court would. *Id.* A party seeking summary judgment must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The movant must designate sufficient evidence to eliminate any genuine factual issues, and once the movant has done so, the burden shifts to the nonmovant to come forward with contrary evidence. *Butler v. City of Peru*, 733 N.E.2d 912, 915 (Ind.2000). The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the non-movant, and resolve all doubts against the moving party. *Sham-*

baugh & Son, Inc. v. Carlisle, 763 N.E.2d 459, 461 (Ind.2002). In order to prevail on a motion for summary judgment in a negligence action, the defendant must demonstrate that the undisputed material facts negate at least one of the elements essential to plaintiff's claim or that the claim is barred by an affirmative defense. *McClyde v. Archdiocese of Indianapolis*, 752 N.E.2d 229, 232 (Ind.Ct.App.2001). In an appeal from summary judgment, the appellant bears the burden of persuasion, but we assess the trial court's decision to ensure that the parties were not improperly denied their day in court. *Shambaugh*, 763 N.E.2d at 461.

### I. MacCollum's Affidavit

■ The primary piece of evidence upon which Vaughn relies in his opposition to the summary judgment motions filed by Daniels and Solar is the affidavit of David MacCollum, P.E., CSP. Before considering whether the trial court properly ruled on the summary judgment motions, we must first determine whether the MacCollum affidavit contains inadmissible evidence. If it does, we will not consider those portions in determining whether the entry of summary judgment was proper. *See* Ind. Trial Rule 56(E) (stating that "[t]he trial court may consider only evidence that can be admitted at trial in reaching a summary judgment determination"). When an exhibit to a summary judgment response would not be admissible at trial, the exhibit should not be considered when ruling on a summary judgment motion because the exhibit cannot create an issue of material

---

4. Vaughn also challenges the trial court's conclusion that his injuries were not proximately caused by the actions of Daniels and Solar as required to sustain a negligence action. However, because we determine as a matter of law that Daniels and Solar did not owe a duty to Vaughn, we need not address the question of proximate cause. *See McClyde v.*

*Archdiocese of Indianapolis,* 752 N.E.2d 229, 232 (Ind.Ct.App.2001) (stating that in order to prevail on a motion for summary judgment in a negligence action, the defendant must demonstrate that the undisputed material facts negate at least one of the elements essential to plaintiff's claim or that the claim is barred by an affirmative defense).

fact. *Kronmiller v. Wangberg*, 665 N.E.2d 624, 627 (Ind.Ct.App.1996), *trans. denied.* The admissibility of the affidavit is thus a threshold question.

Daniels moved to strike portions of the affidavit on the basis that they were without foundation, consisted of inadmissible legal conclusions and speculation, and were based on otherwise inadmissible evidence. Daniels complained that MacCollum neither visited nor inspected the facility where Vaughn was injured and that he did not indicate he had any experience with the design and function of coal preparation plants. The trial court did not rule on Daniels' Motion to Strike. However, it did grant Solar's Motion to Strike one paragraph in the affidavit, which motion had been based upon the argument that the paragraph stated a legal conclusion without foundation and incorporated a conclusion that is not the type of information acceptable under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

MacCollum's affidavit details his education as a professional engineer and certified safety professional and outlines his experience as a safety engineer. The experience includes teaching, testifying before U.S. government bodies, serving on professional organization boards, and authoring books and articles. MacCollum's affidavit then states in relevant part:

11. I have reviewed the following information in this above captioned matter:

a. Defendants' Motions for Summary Judgment (and Affidavits);

b. Plaintiffs' Response to Defendant Daniels['] First Motion for Summary Judgment;

c. Plaintiff Stephen Vaughn's Deposition;

d. Design, Procurement, and Construction of the Cannelburg Preparation Plant for Solar Sources, Inc. Revised January 27, 1995;

e. Defendant Daniels['] Health and Safety Policy;

f. Erection and Concrete Placement Contract between the Daniels Co. and Trimble Engineers & Constructors, Inc.;

g. Defendant Daniels' Daily Field Reports;

h. Portions of Diagrams Produced in Discovery.

i. December 14, 1995 information authored by Joe France, Solar Sources, Inc.'s Safety Director.

The above documents are the type of information normally relied upon by me in the field of my expertise in providing opinions.

12. Based upon my engineering expertise and review of the documents listed above, it is my opinion the design of the heavy media sump in question was not in conformity with reasonable safety engineering practices, *and therefore, unreasonably dangerous.* The design of the facility to house the heavy media sump did not include a beam to suspend a chain hoist to afford safe assembly and maintenance disassembly of heavy long pipe components. *Such an unsafe design, which relies upon manhandling heavy and long components, becomes a foreseeable proximate injury to Mr. Vaughn.*

Basic engineering required the heavy media sump in question to undergo a hazard and risk assessment to determine the hazards and risks to persons. An example of a hazard analysis is a failure mode and effect analysis (FMEA), fault tree analysis (FTA), and human error rate prediction. Defendant Daniels' Health and Safety Policy recognizes these hazard analyses. It states that its safety department personnel

should be knowledgeable in a number of the more popular safety analysis techniques that may be used to recognize, evaluate, and control hazards. The policy further states that using these hazard analysis techniques would enable the Daniels' Safety Department Personnel to determine the safest, most efficient means of controlling hazards. Had Defendant Daniels implemented one of these hazard analyses relating to the design of the heavy media sump, it would have learned that there was a lack of structural members to support a suspended chain hoist and also inadequate guarding (i.e. railing) at the top of the heavy media sump for foreseeable use by persons inside the heavy media sump. The key to design safety is to address fall prevention, which requires the design that provides a safe facility where falls will not occur. The use of fall protection (i.e. lanyards, harnesses, or safety belts) is only necessary when falls are anticipated and cannot be eliminated by design. Fall prevention relies upon voluntary use and is vulnerable to err of omission, therefore, a designer of a facility, such as Defendant Daniels, has the responsibility to design primarily for fall prevention and not fall protection. Defendant Daniels' design plans for the heavy media sump provides a ladder for access into the top of the heavy media sump. With such access, it is foreseeable that persons would intend to work, maintain, or stand in the heavy media sump. The height of the heavy media sump according to the construction plans is 14½ feet from its base to the top edge. *With that type of height, Defendant Daniels failed to exercise reasonable care by failure [sic] to provide a structural member to support a suspended chain hoist and failure [sic] to incorporate a railing around the top of the heavy media sump to guard against*

*falling.* It was technologically and economically feasible to incorporate an additional structural member and a railing around the top of the heavy media sump prior to December 12, 1995. *Failure to have a structural member and a railing around the top of the heavy media sump rendered the heavy media sump unreasonably dangerous.*

*In my opinion, failure to use safety engineering relating to the design of the heavy media sump proximately resulted in injuries to Mr. Vaughn.*

13. Another basic safety engineering principle as it relates to the design of products is that a designer is responsible for minimizing hazards and/or risks associated with a product. If a designer cannot design out a hazard, then the designer must guard against the hazard. If the designer cannot guard against the hazard, then the designer must warn of the hazard. Only as a last resort, should a designer rely upon protective gear for human beings to substitute the above safety engineering solutions. It is important to note the procedures outlined above are a hierarchy of safety engineering. That is, the design consideration is first, followed by guarding, warning and reliance upon protective gear for human beings.

*Defendant Daniels failed to use reasonable care by not applying the above safety engineering principles resulting in its failure to incorporate a structural member and a handrail into the design of the heavy media sump.* Had Defendant Daniels applied the above safety engineering principles by designing a handrail for the top of the heavy media sump, Mr. Vaughn would not have been injured, as his fall would have been prevented.

Further, according to the bid specifications of Defendant Daniels for the

project, it states that handrails shall be provided in accordance with good·safety practices.

14. *Based upon the discovery and documents, it is my opinion Defendant Daniels knew or in the exercise of reasonable care should have known that persons, such as Mr. Vaughn, intended to do work, maintenance, or stand in the top of the heavy media sump, as the heavy media sump was designed to have a ladder for access.* With such knowledge, Defendant Daniels was required to use reasonable safety-engineering principles to minimize the risk of serious injury to the extent it was technologically and economically feasible.

15. *Based upon my engineering and construction management expertise and review of the documents listed above, it is my opinion Defendants Daniels failed to use reasonable care by not having construction management plan and/or a process of plant assembly plan for the design.*

16. Based upon my engineering and construction management expertise and review of the documents listed above, it is my opinion Defendants Daniels were [sic] not in conformity with reasonable safety construction practices by failing to have a construction management plan and/or a process of plant assembly plan for the design of the Cannelburg Project. *The failure to have a construction management plan and/or a process of plant assembly plan for the design of the Cannelburg Project site proximately resulted in Mr. Vaughn's injuries.*

17. *Based upon engineering and construction management expertise and review of the documents listed above, it is my opinion Defendant Solar as owner of the property in question failed to use reasonable care by not requiring and/or participating in a construction manage-*

*ment plan and/or a process of plant assembly plan for the design of the Cannelburg Project. Failure to use such reasonable care proximately resulted in injury to Mr. Vaughn.*

18. The opinions stated herein are based upon a reasonable degree of certainty in the field of safety engineering and construction management.

Appellant's App. pp. 543–47 (footnotes omitted) (emphasis supplied).

A summary judgment affidavit must be made of personal knowledge, set out admissible facts, and show that the affiant is competent to testify as to the matters stated therein. T.R. 56(E). The mere assertion of conclusions of law or opinions in an affidavit does not suffice. *Id; see also Rubin v. Johnson,* 550 N.E.2d 324, 327 (Ind.Ct.App.1990), *trans. denied.* The facts or data upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Ind. Evidence Rule 703. Unlike lay witnesses, experts may testify to opinions based on inadmissible evidence, provided that it is the type of information reasonably relied upon by experts in the field. *Id.*

Initially, we note that neither Daniels nor Solar challenges MacCollum's professional credentials and other qualifications beyond their objection to the fact that he had limited experience with coal sumps and had not personally examined the one at issue here. Although Trial Rule 56(E) mandates that affidavits be made on personal knowledge, this does not mean that an expert must obtain his knowledge based solely on first-hand experience. *See Bunch v. Tiwari,* 711 N.E.2d 844, 849 (Ind. Ct.App.1999). Our courts have never held that an expert witness can only testify from facts learned by personal experience. *Id.* "A witness who testifies as an expert need not base her opinion testimony on

personal knowledge if the opinion is based on evidence of a type normally found reliable and customarily relied upon by others in the witness's profession or area of expertise." *Id.* (quoting *Kranda v. Houser–Norborg Med. Corp.,* 419 N.E.2d 1024 (Ind.Ct.App.1981)). Knowledge may be acquired through hands-on experience, formal education, specialized training, study of textbooks, performing experiments, and observation. *Id.* (citing 13 W. MILLER, INDIANA PRACTICE § 702.103 at 35–37 (1984)). Contrary to Daniel's contentions, it was not necessary for MacCollum to have seen the sump in person for him to render an expert opinion in this case. Also, any question as to his experience with coal plants would go to the weight and credibility of his opinions, not their admissibility.

We next turn our attention to Daniels' claims that the affidavit is conclusory and contains improper legal conclusions. In *Scott v. City of Seymour,* 659 N.E.2d 585, 592–93 (Ind.Ct.App.1995), we held that the affidavit of a safety engineer was admissible and sufficient to create a genuine issue of material fact when it gave the affiant's "expert" opinion on the conditions of a site even though he never actually inspected the site. The defendant had asserted that the expert's statement was "conclusory" and not based upon personal knowledge as the affidavit did not indicate that the expert ever had an opportunity to observe the area in which the plaintiff fell. The defendant had further argued that the opinion was conclusory because it contained no explanation of the purported low cost methods of repair. Although the expert had not visited the site of the fall, he based his expert opinion on deposition testimony of the defendant's witnesses describing the area, photographs of the area, as well as his education and experience as a safety engineer. *Id.* at 592. We held that his opinion was not without foundation

as it was based on facts made available to him in the record. *Id.* We further held that to the extent that his statement was conclusory, any lack of detail in the affidavit went to the weight and credibility of the affidavit and not to whether it was adequate to create a genuine issue of material fact. *Id.* at 592–93.

In *Dorsett v. R.L. Carter, Inc.,* 702 N.E.2d 1126 (Ind.Ct.App.1998), *trans. denied,* the plaintiff was injured when the vehicle he was driving collided with a tractor-trailer. In opposing the defendants' summary judgment motion, Dorsett submitted the affidavit of an accident reconstruction expert. The defendants argued that the opinion in the affidavit would be inadmissible because it lacked sufficient factual foundation to be admissible. The defendants further argued that the expert was unable to adequately explain how he reached his conclusion. They did not contend he was unqualified to render an expert opinion, nor did they suggest that such testimony would not have assisted the trier of fact. Rather, they argued that the expert's conclusion was completely unsupported by reasoning and fact as demonstrated by his inability to adequately explain how he arrived at his opinion.

We noted that Indiana Evidence Rule 705 provides: "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." We concluded that the expert's opinion was admissible and that it was sufficient to raise a genuine issue of material fact regarding whether the defendants breached a duty and proximately caused the plaintiff's injuries. *Id.* at 1128–29. We held that the admissibility of expert testimony did not hinge on the expert's

disclosure of the facts and reasoning that supported his opinion. *Id.* at 1128. We further held that the lack of facts and reasoning, which may be brought out on cross-examination of the expert, went to the weight to be given the expert's opinion, not its admissibility. *Id.*

As in *Scott* and *Dorsett,* the bulk of MacCollum's affidavit is sufficient to satisfy the admissibility rules for affidavits offered in opposition to summary judgment. First, there was a sufficient foundation established for his opinions regarding safety engineering and design principles. MacCollum's affidavit relies upon information upon which an expert is entitled to rely, and it was information of the type normally relied upon by experts in his field. Thus, the fact that some of the items may have contained hearsay or may have been inadmissible is irrelevant. *See Bixler v. State,* 471 N.E.2d 1093, 1099–1100 (Ind.1984) (holding that reliance on hearsay information does not destroy the witness' expert status, but only goes to the weight of the testimony when considered by the trier of fact). Moreover, this court has held that an expert may offer his opinion based in part upon reports not in evidence and upon inadmissible hearsay, provided (1) the expert has sufficient expertise to evaluate the accuracy and reliability of the information, (2) the report is of the type normally found reliable, and (3) the information is the type customarily relied upon by the expert in the practice of his profession. *Faulkner v. Markkay of Indiana, Inc.,* 663 N.E.2d 798, 800 (Ind.Ct. App.1996), *trans. denied.* There is a sufficient foundation for MacCollum's opinions offered in the affidavit concerning engineering standards and procedures, as well as the design of the sump. Any challenges to the merits of those conclusions and the premises upon which they were made appear to go to the weight of MacCollum's testimony, not its admissibility. *See Dorsett,* 702 N.E.2d at 1128.

We agree with Daniels, however, that the affidavit does contain improper legal conclusions. In particular, the portions underlined in the excerpted section above constitute legal conclusions relating to proximate cause and reasonable care. We are cognizant of the "trend … to allow expert opinion testimony even on the ultimate issue of the case, so long as the testimony concerns matters which are not within the common knowledge and experience of ordinary persons and will aid" the trier of fact. *Major v. OEC–Diasonics, Inc.,* 743 N.E.2d 276, 285 (Ind.Ct.App. 2001); *see also Koziol v. Vojvoda,* 662 N.E.2d 985, 990–91 (Ind.Ct.App.1996) (permitting officer to testify as to who was at fault in a car accident because he qualified as an expert based on his training, education, and experience); *Osmulski v. Becze,* 638 N.E.2d 828, 837 (Ind.Ct.App.1994) (relying on Evidence Rule 704(a) to hold that there was no abuse of discretion in allowing an expert to testify as to proximate cause of an accident because the expert witness had knowledge and experience that would be helpful to the jury in understanding the evidence surrounding the accident); *Prange v. Martin,* 629 N.E.2d 915 (Ind.Ct.App.1994) (holding that police officer's testimony as to cause of accident is admissible as long as opinion was based upon special expertise and not merely on hearsay statements of the parties to the accident), *trans. denied.; but see Steuben County v. Family Dev., Ltd.,* 753 N.E.2d 693, 698 (Ind.Ct.App.2001) (excluding paragraphs from an affidavit describing as a matter of law how an applicant may obtain approval for a landfill under a zoning ordinance, which was the focus of the case).

We remain of the opinion, however, that experts should not be permitted to offer

legal conclusions as part of their testimony because to do so would violate the spirit of Evidence Rule 704(b), which provides that "[w]itnesses may not testify to opinions concerning ... legal conclusions." The purpose of the rule is that legal conclusions from a witness are not helpful to the trier of fact; the judge, not an expert witness, instructs on the law. Thus, we strike those portions of the affidavit underlined above. Questions as to the substance and veracity of the remaining opinions contained in the affidavit are for the trier of fact to consider if the case proceeds to trial. *See Sears Roebuck & Co. v. Manuilov,* 742 N.E.2d 453, 461 (Ind.2001) (holding that once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact).

### II. "User" or "Consumer"

Next, we consider whether Vaughn was a "user or consumer" of the sump under the Act. The Act provides:

a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any *user or consumer* or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

(1) that user or consumer is in the class of persons that the seller should *reasonably foresee* as being subject to

the harm caused by the defective condition;

(2) the seller is engaged in the business of selling the product; and

(3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this article.

I.C. § 34–20–2–1 (formerly I.C. § 33–1–1.5–3) [5] (emphasis added). A "user or consumer" is defined by the Act as:

a purchaser, any individual who uses or consumes the product, or any other person, who, while acting for or on behalf of the injured party was in possession or control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

I.C. § 34–6–2–29 (formerly I.C. § 33–1–1.5–2(1)).

The trial court found that Vaughn was not a "user or consumer" under this provision. There is no factual dispute here regarding Vaughn's relationship to the product: he worked for a subcontractor that was hired by Daniels to install, among other things, the sump, which had been designed by Daniels and manufactured by another company. The question before us, therefore, is whether such an employee is a "user or consumer" for purposes of the Act. This is a pure question of law, requiring only an application of the law to undisputed facts, and it is thus appropriate for determination on summary judgment. *See* T.R. 56(C); *Thiele v. Faygo Beverage, Inc.,* 489 N.E.2d 562, 585–86 (Ind.Ct.App. 1986), *trans. denied.*

---

**5.** At the time of the incident, this provision was codified at Indiana Code Section 33–1–1.5–3. The legislature has since recodified the Act at Indiana Code Sections 34–20–1–1 to –9–1 with only stylistic changes. See Pub.L. No. 1–1998, § 15, 1998 Ind. Acts 125–30.

Daniels argues that because it designated evidence demonstrating that the sump was not intended to be used as a "construction scaffold," a person in Vaughn's position was not a foreseeable user or consumer of the coal sump. Daniels further argues that the sump had not been injected into the stream of commerce and that Vaughn was not a member of the consuming public and, as a result, that Vaughn cannot maintain a product-based claim.

The only portion of the statutory definition of "user or consumer" that could include Vaughn in the present circumstances is that which includes "any individual who uses ... the product," because Vaughn clearly did not purchase or consume the product or possess it while acting on behalf of an injured party. An obvious case to consider in analyzing whether Vaughn is a "user," and one relied upon by the trial court, is *Thiele*, 489 N.E.2d at 562. In that case, Thiele was injured by an exploding pop bottle while he was stocking it. We determined that as a " 'middle man' employee at the distribution level of his employer's business who handled Faygo's product as it flowed through the stream of commerce toward the retail purchaser[,]" Thiele was not within the class of plaintiffs intended to be protected by the Act. *Id.* at 585, 588. We stated, "It appears the legislature intended 'user or consumer' to characterize those who might foreseeably be harmed by a product at or after the point of its retail sale or equivalent transaction with a member of the consuming public." *Id.* at 586. We concluded that the phrase did not include intermediaries in the distributive chain and thus that it was not intended to include the employees of such intermediaries. *Id.* at 588. Ultimately, we determined that "our legislature has required a 'sale' to a 'first consuming entity' before the protection afforded by the Act is triggered." *Id.*

Even at that time, we conceded the difficulties caused by the holding and stated:

such an employee and such bystander are both foreseeably subject to harm caused by a defective product; neither is able to protect himself from such harm by choosing to deal with only reputably safe products. Thus, it would seem that a person in Robert Thiele's position in the chain of distribution of a product from manufacturer to consuming entity is as deserving of the protection of our Product Liability Act as any bystander. Nevertheless, it appears our legislature has required a "sale" to a "first consuming entity" before the protection afforded by the Act is triggered, and Robert Thiele's injury occurred before such a transaction involving Faygo's product took place.

*Id.* Thus, we concluded that because Thiele was not a "user or consumer" of Faygo's product as defined in our product liability statute, he was not entitled to the benefit of the strict liability theory of recovery stated therein. *Id.*

The *Thiele* case is factually distinguishable from the case before us. Vaughn did not work for an intermediary who merely transported merchandise to the ultimate consumer. Rather, he worked for a subcontractor of Daniels. Daniels designed the product and was hired to actually install the product for the consumer after purchase, which in this case was initially Daniels, as the designer, and ultimately Solar, as the owner. The consumer in this case also designed the product and custom ordered it on behalf of Solar. Daniels hired Trimble to install the product to Daniels' specifications and plans. Thus, Vaughn did not merely work for a passing intermediary but rather worked for the company hired by the designer and purchaser of the product, the first consuming entity. The sump was at its final destina-

tion and was being installed for use. Unlike a case of soft drinks, the sump was not a transient product.

The "logical inconsistency" in *Thiele* was noted in *Crist v. K-Mart,* 653 N.E.2d 140, 143 (Ind.Ct.App.1995), which was also cited by the trial court. In *Crist,* the plaintiff was a truck driver for a company hired to transport K-mart's merchandise from its distribution centers to its retail stores. He was injured while unloading merchandise at one of the retail stores. He stood on a box inside the trailer attempting to reach another box when the box upon which he was standing collapsed. Rather than resolving the "logical inconsistency" of *Thiele,* we upheld summary judgment in favor of K-mart on the basis that it was not a seller of boxes but only in the business of selling products contained in the boxes. *Id.* at 143. We held that the "occasional seller who is not engaged in that activity as part of his business is not liable in products liability." *Id.*

Our case is also distinguishable from *Crist.* In that case, the plaintiff sued K-mart for injuries caused by standing on a box that K-mart did not design or make. Here, Vaughn sued Daniels for injuries caused by an allegedly unreasonably dangerous product that Daniels designed. Daniels cannot be said to be an "occasional seller who is not engaged in that activity as part of [its] business." *Id.* The design of the coal plant, including the sump, is the reason Solar contracted with Daniels in the first place based on similar prior transactions with each other.

Another case cited by the trial court is *Lukowski v. Vecta Educational Corp.,* 401 N.E.2d 781 (Ind.Ct.App.1980), which involved a plaintiff who fell from the top of the balcony bleachers in a high school gymnasium. The school had elected to use the bleachers in a partially finished condition before the railings had been delivered. We held that an unfinished product did not meet the "delivery" prerequisite for the imposition of liability under the Act. *Id.* at 786. We reasoned that under the Act, liability attached only when the product had been delivered to the user or consumer "in the condition, or substantially same condition, in which it is expected to reach the ultimate consumer." *Id.* We held that the necessary premise for liability was not supported by the evidence because the school elected to use the bleachers in a partially finished condition and before the bleachers had been "delivered." *Id.* at 787.

This case is distinguishable because the school in *Lukowski* opted to use the bleachers before the railing had been shipped and installed. In our case, the sump was not designed with a railing. Moreover, the person injured in *Lukowski* was a person attending an event at the school where the bleachers were being used by the school in an incomplete state. As such, the injury was not foreseeable to the manufacturer because it was not expected that the school would use the bleachers for members of the public in a partially completed state. Here, the injured person was installing the product, which was foreseeable and expected by Daniels, the designer of the product. Vaughn was not injured as a result of someone using the sump in an incomplete state in an unforeseeable manner. Indeed, Daniels hired Trimble to install the sump according to its plans in order for the machine to become operational.

The final case cited by the trial court is *Wingett v. Teledyne Industries,* 479 N.E.2d 51 (Ind.1985).[6] In that case, the

---

**6.** The analysis in this case dealing with the issue of premises liability was found to be

faulty in *Douglass v. Irvin,* 549 N.E.2d 368 (Ind.1990). However, this does not affect the

plaintiff had been hired to remove ductwork in a foundry and was injured when a portion of the ductwork fell to the floor as he cut the support hangers. Our supreme court held that "a manufacturer's potential liability for products placed in the stream of commerce does not extend to the demolition of the product." *Id.* at 56. In so holding, the court reasoned that it was necessary to look at the intended use of a product in analyzing the issue of foreseeable use in determining whether a plaintiff is a user or consumer. *Id.* The court considered the product's intended use—the collection of dust from machinery used in the foundry—and asked whether there was "any risk inherent in the intended use of the ductwork." *Id.* The court held:

> While the question of foreseeability is generally one of fact for the jury, we hold that appellant's "use" of the ductwork was not reasonably foreseeable as a matter of law, notwithstanding appellant's allegation that he was employing the standard trade procedure for duct removal. Because the dismantling and demolition of the ductwork was not a reasonably foreseeable use of the product, Ramsey and Severs owed no duty to appellant to warn of any risks related to his work as part of the demolition crew. A manufacturer need only warn of reasonably foreseeable dangers.

*Id.*

In a recent case, our supreme court again considered the notion of reasonably foreseeable use of a product and, as a result, whether a plaintiff could pursue a cause of action under the Act. *Stegemoller v. ACandS, Inc.,* 767 N.E.2d 974 (Ind. 2002).[7] In that case, a union insulator and

his wife brought a products liability action against asbestos manufacturers after the wife developed a disease allegedly caused by exposure to asbestos residue on the insulator's clothing. The trial court dismissed the action, and we affirmed on the basis that the wife was not a "user or consumer" within the meaning of the Act because she was not directly exposed to the product. *Stegemoller v. ACandS, Inc.,* 749 N.E.2d 1216 (Ind.Ct.App.2001). The supreme court vacated our opinion and held that she had standing as a bystander to bring an action against the manufacturers. *Stegemoller,* 767 N.E.2d at 976.

Our supreme court first acknowledged the legislature's intent that "Indiana's Product Liability Act govern all product liability actions, whether the theory of liability is negligence or strict liability in tort ...." *Id.* at 974. The court then commented that the manufacturers' argument that the wife was not in the product's vicinity during its "reasonably expected use" was too restrictive. *Id.* at 976. The court found that the reasonably expected use of asbestos products encompassed customary clean-up activities such as the cleansing of asbestos residue from one's person and clothing at the end of the workday. In so holding, our supreme court cited *Butler v. City of Peru,* 733 N.E.2d 912 (Ind.2000), wherein it held that a maintenance worker who was electrocuted while trying to restore power to an electrical outlet was a user or consumer as defined in the Act. The supreme court stated, "Implicit in that holding was the assumption that maintenance may be part of a product's reasonably expected use." *Stegemoller,* 767 N.E.2d at 976.

---

holding or reasoning relied upon by the trial court in our case.

**7.** The supreme court also issued companion cases to *Stegemoller* on the same day. *See*

*Martin v. ACandS, Inc.,* 768 N.E.2d 426 (Ind. 2002); *Camplin v. ACandS, Inc.,* 768 N.E.2d 428 (Ind.2002).

Although the supreme court held that the spouse had standing as a bystander because maintenance and/or cleaning up could be a "reasonably expected use," the holding is instructive to our analysis as to whether Vaughn was a user for purposes of the Act. The definition of "user or consumer" includes bystanders:

a purchaser, any individual who uses or consumes the product, or any other person, who, while acting for or on behalf of the injured party was in possession or control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

I.C. § 34–6–2–29. By holding that the spouse had standing as a bystander, the supreme court necessarily found that she was a "user or consumer" for purposes of the Act. It is axiomatic that a bystander who would be reasonably expected to be in the vicinity during its reasonably expected use, namely maintenance in *Stegemoller* and *Butler*, is a user of the product. Also, it is self-evident that if, for example, maintenance is a reasonably expected "use" of a product, the person performing the maintenance is a "user" of the product. Thus, the supreme court's analysis as to who falls within the definition of "user and consumer," even as a bystander, is instructive to our analysis today.

Furthermore, the *Stegemoller* decision is significant because it further clarifies the supreme court's interpretation of the Act and who should be deemed to have standing to pursue claims under the Act. By approving maintenance and "customary clean-up activities" as reasonably expected uses for purposes of determining who is a user or consumer, including bystander, the supreme court expanded the application of the Act to activities beyond the exact intended purpose of the product. The supreme court included not only the intended use of the product, but also those activities related to furthering the use of the product. For example, the supreme court theoretically expanded the definition to the point where it would include someone injured while cleaning a defective pool as opposed to someone injured while swimming in it, which would be the specific intended purpose of the pool.

It is a logical extension of the supreme court's analysis to include in the definition of user or consumer a person who is injured while installing a product. The installation of a product is the preparation of a product for safe operation, just as maintenance is in many cases. Maintenance would also include the repair of broken products that cannot otherwise operate, just as the installation process renders a product operational. The fact that the sump was not yet being used for its primary intended purpose, namely the processing of slurry, is not fatal to Vaughn's case because the installation would be encompassed under the umbrella of reasonably expected uses. It was foreseeable to Daniels, indeed planned, that a subcontractor such as Trimble would be installing the sump and surrounding equipment. The sump could not become operational for its intended purpose without being installed by professionals. In this sense, it is a different kind of product than many other consumer products affected by the Act. The installation process was not only foreseeable but expected and routine, just as the cleaning process was in *Stegemoller* and the maintenance was in *Butler*. If Vaughn was, in fact, injured by Daniels' defective product, it seems illogical that he would be precluded from pursuing a suit against Daniels simply because the sump was not completely installed when he was injured while trying to install it, particularly when the alleged defect affected his

ability to install it safely. The alleged defect about which Vaughn complains relates to the process by which the sump would be installed, not operated once fully functional.

After reviewing the numerous cases discussing similar questions as that posed to us today, we conclude Vaughn was a user for purposes of the Act. We hold Vaughn has standing to pursue an action against Daniels pursuant to the Act.

### III. "Defective" or "Unreasonably Dangerous" Condition

Vaughn next challenges the trial court's conclusion that there were no genuine issues of material fact as to whether the sump was defective or unreasonably dangerous. The trial court found that even "if the coal sump is considered a product, it was not in a condition contemplated by reasonable persons among those considered users or consumers, as such users or consumers, like Plaintiff, knew of and appreciated the risk of falling when working at heights." Appellant's App. pp. 20–21. The trial court also found that if used in a reasonably expected manner, the coal sump was not unreasonably dangerous to expected users or consumers.

■ The question whether a product is unreasonably dangerous is usually a question of fact that must be resolved by the jury. *Cole v. Lantis Corp.,* 714 N.E.2d 194, 200 (Ind.Ct.App.1999). A product is "defective" only "if, at the time that it is conveyed by the seller to another party, it is in a condition: (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption." I.C. § 34–20–4–1. The phrase "unreasonably dangerous" refers to "any situation in

which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." I.C. § 34–6–2–146.

■ Reasonably expectable use, like reasonable care, involves questions concerning the ordinary prudent person, or in the case of products liability, the ordinary prudent consumer. *Short by Southerland v. Estwing Mfg. Corp.,* 634 N.E.2d 798, 801 (Ind.Ct.App.1994). The manner of use required to establish "reasonably expectable use" under the circumstances of each case is a matter peculiarly within the province of the jury. *Id.* The test of reasonably expectable use centers on the manner of use that an ordinary prudent consumer would employ under the same or similar circumstances. *Id.* In applying the test, it is not what the fact finder would have done as an individual, or in the case of a jury, even collectively. *Id.* Rather, it is a matter of what the fact finder determines the abstract, reasonable prudent consumer, would have done under the circumstances. *Id.* In any event, we have held that questions of reasonableness cannot generally be resolved by motions for summary judgment. *Id.*

Here, it is undisputed that the sump was ultimately intended to be used to pump slurry to a heavy media cyclone where the coal is separated from rejected material. Daniels emphasizes that neither the plant nor the sump were operational or capable of being operated at the time of Vaughn's fall. Daniels insists that the sump was not meant to serve as a construction platform and was not being used as intended by Vaughn. Daniels relies upon the professional opinions of Daniel Flesher and Surendra Jain, both professional engineers, whose opinions were that the sump from

which Vaughn fell was not unreasonably dangerous when used for its intended purpose. Both engineers opined that the sump was typical of sump designs in coal preparation plants being constructed throughout the country at the time of Vaughn's fall.

In response, Vaughn relies upon the affidavit of MacCollum, which opines that design flaws rendered the sump unreasonably dangerous. In particular, he emphasizes that the sump did not have a handrail around the top and that it did not have some sort of apparatus above from which the pipe could be safely hoisted, thus avoiding the predicament that led to Vaughn's fall.

■■■ There is a temptation to become subsumed by the definitions of "defective" and "unreasonably dangerous" and distracted by considerations of foreseeability and "expectable uses" in analyzing this issue. However, because we have concluded that the legal conclusions contained in MacCollum's affidavit should be stricken, we look only to whether the remaining portions and the other designated evidence create an issue of fact, not whether the opinions themselves are substantiated or accurate. In doing so, it is clear that we have two experts maintaining one position, namely that the product was not being used for its intended purpose and is not dangerous when used for the proper purpose. We also have one expert taking the opposite stance, namely that there were design flaws in the sump that rendered it out of compliance with accepted safety standards. This contradiction is the classic question-of-fact scenario contemplated by Trial Rule 56, which necessarily precludes summary judgment on this issue.

### IV. Misuse and Incurrence of Risk

#### A. Misuse

The trial court found that "[e]ven if the coal sump is considered a product, Plain-

tiff's injuries were caused by his misuse of the sump, because he knew of and appreciated the risk of falling when working at heights, but failed to use the sump in a foreseeable manner." Appellant's App. p. 21. The trial court further found that Vaughn "misused the sump to the extent that it was not foreseeable for Daniels Company to expect Plaintiff to fail to tie off when working at heights and for a bolt to 'foul' in the steel of the pipe Plaintiff was attempting to maneuver in place." Id.

■■■ Under Indiana Code Section 34–20–6–4, "[i]t is a defense [to a strict liability action] that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party." See Indianapolis Athletic Club, Inc. v. Alco Standard Corp., 709 N.E.2d 1070, 1072 (Ind.Ct.App.1999), trans. denied. Foreseeable use and misuse are typically questions of fact for a jury to decide. Montgomery Ward & Co. v. Gregg, 554 N.E.2d 1145, 1151–52 (Ind. Ct.App.1990), trans. denied. However, some courts have granted summary judgment on the defense of misuse. See, e.g., Estrada v. Schmutz Mfg. Co., 734 F.2d 1218, 1221 (7th Cir.1984) (barring claim of worker who attempted to ink printer by hand where it was not intended that printer be inked by hand); Latimer v. General Motors Corp., 535 F.2d 1020, 1024 (7th Cir.1976) (holding manufacturer had no duty to anticipate misuse).

Daniels contends that Vaughn was not using the sump as intended because he was using it as a construction platform. Daniels designated the affidavit of Daniel Flesher, the President of Trimble. In that affidavit, Flesher opines that the sump was "constructed in a similar manner to other

sumps in coal preparation plants being constructed at the time" and was "typical with sump designs being utilized throughout" the state and country. Appellant's App. p. 296. In addition, Flesher states that the purpose of a heavy media sump is to provide a feed to the heavy media cyclone pump and that Vaughn was not using the sump for its intended use at the time he was injured. Daniels also designated the affidavit of Surendra Jain, President of Daniels, in which Jain posits that "[t]he sump was not meant to serve as a construction platform as utilized by Mr. Vaughn" and that the sump "conformed with the generally recognized configuration of heavy media sumps at the time." Appellant's App. p. 292. Jain further concludes that the sump was not being used, nor was it capable of being operated, for its intended purpose at the time of the injury.

In response, Vaughn argues that the mere fact the blueprints show that a ladder allowed access into the sump means that he was using the sump in a foreseeable manner. Furthermore, Vaughn testified in his deposition that his coworkers were "limited in what they could do with that piece of pipe because there was no place overhead to hang a chain fall. So they had a chain fall that was hooked back—farther than where it needed to be." Appellant's App. p. 376. Vaughn also testified that he had been on approximately twenty to twenty-five sumps and that the other sumps and pipes were similar to the one from which he fell. He stated, however, that at the other sites the configuration and design were different such that there

was steel overhead from which hangers could be used to hold the pipe during installation. He testified that here, there was no such steel and as such no ability to support the pipe from above. He further testified that the fine coal sump, another of the three on the site, had a handrail around the top. MacCollum stated in his affidavit, "The design of the facility to house the heavy media sump did not include a beam to suspend a chain hoist to afford safe assembly and maintenance disassembly of heavy and long pipe components . . . ." Appellant's App. p. 544.

 After reviewing the designated evidence, we conclude there is an issue of fact as to misuse. Although we are of the opinion it was foreseeable that workers would be on the sump based on the presence of the ladder, there is conflicting evidence as to the manner in which the pipe was being installed while Vaughn and the other workers were on the top of the sump and whether such use constituted misuse.[8]

### B. Incurrence of Risk

Vaughn also challenges the trial court's conclusion with respect to incurrence of risk. Indiana Code Section 34–20–6–3 provides a complete defense where a plaintiff incurs the risks associated with the use of a product:

> With respect to any action brought under [the products liability statute] . . . It is a defense that the user or consumer bringing the action knew of the defect and was aware of the danger in the product and nevertheless proceeded to

---

8. The trial court granted summary judgment on this issue finding in part that Vaughn misused the sump because it was not foreseeable for Daniels to expect him to fail to tie off when working at heights and for a bolt to break off the pipe as he was attempting to maneuver it in place. We address the question of tying off in our discussion of incurrence of risk. The mere fact that the bolt broke was not within Vaughn's control and would not, in and of itself, constitute misuse of the sump. We do not further address this conclusion.

make use of the product and was injured.

The trial court found that Vaughn "knew and appreciated the risk of falling that came with not being properly tied off while working at heights and despite his knowledge and appreciation of this risk, failed to take proper safety precautions." Appellant's App. p. 21.

 For summary judgment to be properly entered for incurring the risk, the evidence "must be without conflict and the sole inference to be drawn is that the Plaintiff had actual knowledge of the specific risk and understood and appreciated that risk." *Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 940 (Ind.Ct.App. 1994). In other words, incurred risk can be found as a matter of law only if the evidence is without conflict and the sole inference to be drawn is that the plaintiff knew and appreciated the danger caused by the defendant's negligence, but nevertheless accepted it voluntarily. *Ferguson v. Modern Farm Systems, Inc.*, 555 N.E.2d 1379, 1380 (Ind.Ct.App.1990), *trans. denied.* The injured party must have been more than merely aware of the potential for mishap and must have had actual knowledge of the specific risk. *Id.* However, a specific risk involves only the ordinary and usual risks inherent in a given act. *Id.*

 Incurred risk involves a mental state of venturousness on the part of the actor and demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk. *Schooley*, 631 N.E.2d at 940.

'The incurring of the risk must really be voluntary. If the continued exposure to a known risk of injury ... is the result of influence, circumstances, or surroundings, which are a real inducement to continue, the doctrine does not apply, since the exposure is not in a true sense voluntary.'

*Meadowlark Farms, Inc. v. Warken*, 176 Ind.App. 437, 376 N.E.2d 122, 133 (1978) (citing *Ridgway v. Yenny*, 223 Ind. 16, 57 N.E.2d 581, 583 (1944)).

 We have recognized that the responsibilities and influences arising from involvement in the workplace can be determinative as to the voluntariness of an employee's actions. *Schooley*, 631 N.E.2d at 940. Therefore, the issue of whether an employee has incurred the risk of an activity incidental to his employment is a question of fact for the jury to decide. *Id.* For example, in *Schooley*, we held that the issue of whether an employee voluntarily incurred the risk of her injuries was a question of fact for the jury where she was trying to do the job she was ordered to do and thought that it could be done safely by standing off to the side of a large metal plate. *Id.; see also Richardson v. Marrell's Inc.*, 539 N.E.2d 485 (Ind.Ct.App. 1989) (holding that whether an employee voluntarily incurred the risk of slipping on ice while making a delivery on the job was an issue of fact for resolution by the jury), *trans. denied; Meadowlark Farms*, 376 N.E.2d at 133–34 (holding that whether sharecropper who had been directed to deliver corn to a particular facility had voluntarily incurred the risk posed by an unreasonably dangerous grain auger used at that facility was an issue of fact for resolution by the jury).

Vaughn maintains that the trial court's order ignored the facts leading up to Vaughn's fall, which created an issue of fact as to whether he consciously knew the risks and as to whether "the influences of the situation as it occurred at the time played a part in his decision making process." Appellant's Br. p. 15. In essence, Vaughn contends that his failure to wear his safety belt was not voluntary under the

circumstances because he was rushing to help his coworkers who needed assistance. Thus, although he knew of the general risks of working at heights without wearing a safety belt, his failure to do so in this case was reasonable because of the need to help his coworkers. Furthermore, Vaughn testified in his deposition that there was no place to tie off his safety belt when he was working on the sump or that at the very least, tying it off would have been very difficult. He also testified that there had been a handrail around another sump he had previously installed the sump onto which he could tie off.

Daniels contends that Vaughn knew and appreciated the risk of falling and failed to take proper precautions despite this knowledge. It is undisputed that Vaughn did understand and appreciate the risks of working at heights and the need for him to wear a safety belt. Indeed, he was wearing his belt until moments before the accident. Yet, he failed to put it back on before rushing up the sump to assist his coworkers.

In *Ferguson*, the plaintiff climbed a ladder attached to a grain bin using only one hand and subsequently fell off and sued the various defendants. We held that the plaintiff "knew and appreciated the risk . . . whether he used one hand or two." *Ferguson*, 555 N.E.2d at 1381. He voluntarily accepted that risk as part of his job in part because he had climbed that ladder over twenty times, including five times on the day of the accident. *Id.* at 1380. We held that when one knows and appreciates the risk of falling as a result of a dangerous condition, yet voluntarily continues to use the dangerous instrumentality, the injured party incurs the risk as a matter of law. *Id.* at 1381. We further stated, "the specific risk is not defined as the increased danger of climbing a ladder one-handed, the proper focus . . . is the knowledge of

the condition created by the defendant." *Id.* We found that the defendant had not created a condition that required the plaintiff to climb with one hand. *Id.*

The *Ferguson* case is significant because it is instructive on the type of knowledge the plaintiff must have had about the risk. Applying the same analysis and reasoning to the facts before us, we first need to define the specific risk or risks that Daniels alleges Vaughn incurred. It is true that the undisputed designated evidence is that Vaughn understood the danger of working at heights over six feet without a safety belt and yet climbed to the top of the sump to install the pipe without wearing it or tying off. Using the language in *Ferguson*, Daniels "had not created a condition that required [Vaughn] to climb" without the safety device. *See Ferguson*, 555 N.E.2d at 1381. That being said, however, there remains a question concerning the voluntariness of the failure to wear the belt given the urgent need of the coworkers for help. There is also the risk of working on the sump without a handrail as a result of the allegedly defective design. There remain questions as to whether Vaughn was fully aware that the sump had no handrail before he went up the ladder and that he fully understood the risk of being on the sump without a handrail such that he really could have voluntarily undertaken the task of installing the pipe even in spite of the danger. Thus, questions of fact exist relating to whether Vaughn incurred the risk, and, therefore, summary judgment is not appropriate.

### V. Duty

As part of his negligence claims, Vaughn argues that Daniels and Solar had a duty to him. We first note that in order to recover on a negligence claim, the plaintiff must establish a duty

on the part of the defendant to conform his conduct to a standard of care arising out of his relationship with the plaintiff, a failure on the part of the defendant to conform his conduct to the requisite standard of care, and an injury to the plaintiff that is proximately caused by the breach. *See Franklin v. Benock*, 722 N.E.2d 874, 878 (Ind.Ct. App.2000). Absent a duty, there can be no breach and, therefore, no recovery for the plaintiff in negligence. *Hopper v. Colonial Motel Prop., Inc.*, 762 N.E.2d 181, 188 (Ind.Ct.App.2002). The existence of a duty is a pure question of law for the court to determine. *Foxworthy v. Heartland Co–Op, Inc.*, 750 N.E.2d 438, 441 (Ind.Ct. App.2001). Factual questions, however, may be interwoven in the issue of duty, rendering the existence of a duty a mixed question of law and fact to be determined by the factfinder. *Id.*

■ In Indiana, a principal is not liable for the negligence of an independent contractor unless one or more of five recognized exceptions apply to the facts presented. *Bagley v. Insight Communications Co.*, 658 N.E.2d 584, 586 (Ind.1995). These exceptions are:

(1) where the contract requires the performance of intrinsically dangerous work; (2) where the principal is by law or contract charged with performing the specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken; and (5) where the act to be performed is illegal.

*Blocher v. DeBartolo Prop. Management, Inc.*, 760 N.E.2d 229, 236 (Ind.Ct.App. 2001). Vaughn alleges that Daniels and Solar owed him a duty pursuant to statute and that they had a contractual duty to him. He also alleges that Daniels assumed a duty to him through the conduct of its employees.

### A. Statutory Duty

First, Vaughn claims that Daniels and Solar owed a statutory duty to him. The argument in his brief on this point is rather sweeping and does not elaborate on the particular statutory provisions that he maintains created a duty on the part of Daniels and Solar. He claims that the Coal Mine Health and Safety Act ("MHSA") [9] applied to the property at the time of the incident. He cites *Bituminous Coal Operators' Association, Inc. v. Secretary of Interior*, 547 F.2d 240 (4th Cir. 1977), for the proposition that general contractors who perform both surface and sub-surface construction work for mining companies are subject to the regulations of the Coal Act. He also cites *Bituminous Coal* for the contention that a mining company such as Solar can be "jointly or severally liable" for violations committed by the construction company. Vaughn points to 30 C.F.R. 77.204 as a mandatory safety standard that requires "openings through which men or material may fall shall be protected by railings, barriers, covers, or other protective devices." Citing *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999), he argues that where the principal is by law charged with performing a specific duty, the principal can be held responsible for injury to an independent contractor. Vaughn also points to Daniels' Daily Field Report from the day of the accident, which noted Vaughn's injury and stated, "We will probably be inspected by MSHA tomorrow." Appellant's App. p. 613.

In *Bituminous Coal*, the Fourth Circuit Court of Appeals held inter alia that the Secretary of the Interior ("Secretary") had the authority to cite coal mining companies

---

**9.** The regulations may be found at 30 C.F.R. 77 *et seq.*

for violations of federal health and safety standards committed by construction companies employed by mining companies. 547 F.2d at 247. The court found that the Act authorized the Secretary to impose "substantial" monetary sanctions against the operator of a coal mine by imposing civil penalties and by requiring the operator to pay wages to miners idled by a withdrawal order. *Id.* However, the court specifically stated, "This opinion presents no occasion, however, for determining the proper allocation of liability in view of the myriad factual situations that may arise. Such determination, we believe, is a responsibility that can best be initiated by the Secretary through regulations and adjudication." *Id.* This comment indicates the court's intent to limit the holding. Thus, Vaughn's reliance on this case to create an automatic common law negligence duty on the part of Daniels and Solar is a stretch of the holding at best.

 Furthermore, when a civil tort action is premised upon violation of a duty imposed by statute, the initial question to be determined by the court is whether the statute in question confers a private right of action. *Right Reason Pub'n v. Silva,* 691 N.E.2d 1347, 1352 (Ind.Ct.App.1998). The determination of whether a civil cause of action exists begins with an examination of legislative intent. *Id.* In our view, Congress did not intend that the Act and its regulations would be enforced through a private cause of action alleging the commission of a state common law tort. As mentioned above, the Act authorizes the Secretary to inspect mining operations and impose sanctions, including not only monetary sanctions but also the withdrawal of miners from the site. *See, e.g.,* 30 U.S.C. §§ 814, 819–20. Indeed, the Act contains an elaborate scheme for monitoring compliance with the safety regulations for the protection of coal miners. We decline to

hold that any other penalty, such as civil tort liability, may exist under this statute. *See Right Reason,* 691 N.E.2d at 1352; *LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1260 (Ind.2000) (stating that as a general rule, a private party may not enforce rights under a statute designed to protect the public in general and containing a comprehensive enforcement mechanism); *Coons v. Kaiser,* 567 N.E.2d 851, 852 (Ind. Ct.App.1991) (quoting *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 459, 94 S.Ct. 690, 693–94, 38 L.Ed.2d 646 (1974)) (noting that, "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'").

This holding is consistent with other cases where no private cause of action has been found. For example, in *Wood v. Schuen,* 760 N.E.2d 651, 658–59 (Ind.Ct. App.2001), we addressed the question of whether Schuen could be found personally liable to Wood for Pathologists Associated Medical Laboratory's ("PAML"'s) alleged noncompliance with the Clinical Laboratory Improvement Act ("CLIA"). We noted that there was no authority in federal or state law for the proposition that CLIA provided a private cause of action to persons seeking relief for alleged violations of its provisions and emphasized that nearly every provision of CLIA "explicitly delegates oversight of clinical laboratories such as PAML to the Secretary of Health and Human Services." *Id.* at 658. We concluded the provisions indicated that CLIA oversight was delegated exclusively to the Secretary of Health and Human Services and that nowhere was there an indication that CLIA was intended to create a private cause of action for those seeking relief for a laboratory's alleged violations of

CLIA, particularly in view of the provisions in CLIA that address remedies and sanctions for noncompliance. *Id.* Those provisions permitted only the Secretary of Health and Human Services to impose intermediate sanctions for noncompliance, such as imposing monetary civil penalties; suspending, revoking, or limiting certification of noncompliant laboratories including monetary civil penalties; and seeking to enjoin the laboratory from continuing activity that creates a significant hazard to the public health. We held that the provisions make it clear that only the governmental agencies charged with overseeing laboratories' compliance with CLIA are responsible for enforcing its provisions and imposing penalties for noncompliance. *Id.*

Similarly, in *Borne v. Northwest Allen County School Corp.*, 532 N.E.2d 1196 (Ind.Ct.App.1989), *trans. denied,* we addressed whether a statute that imposed a criminal penalty for the knowing failure to report suspected child abuse provided a private cause of action for a breach of that duty. The statutory language required the reporting of suspected child abuse or neglect, inter alia, "to provide protection for such a child from further abuse or neglect and to provide rehabilitative services for such a child and his parent, guardian or custodian." *Id.* at 1203. Pursuant to the statute, parents of an abused child filed a complaint against a school principal for failing to report abuse by the child's classmates. We held that the statute did not create a private cause of action. *Id.* Rather, the statute was designed to encourage effective reporting of child abuse and establish child protection services. *Id.* We found no intent to impose civil liability for a failure to report. *Id.*

In *Meury v. Eagle–Union Community School Corp.*, 714 N.E.2d 233, 239 (Ind.Ct.

App.1999), a high school student and his parents sued a community school corporation and others alleging damages resulting from the disclosure of information in violation of the student's and parents' privacy rights under state and federal law. We held that a violation of the Family Educational Rights and Privacy Act ("FERPA") did not give rise to a private cause of action by means of 42 U.S.C. § 1983. Id. The enforcement provisions within FERPA explicitly provided that the Secretary of Education was solely responsible for enforcement, including the withholding of funds, thereby preempting a private cause of action. *Id.*

Likewise, the main focus of the Act is to promote safe mining operations for the protection of miners. When the provisions of the Act are considered as a whole, there is no apparent intent to authorize a civil action for failure to follow the procedures contemplated by the Act by creating a common law duty in coal mine owners and general contractors.[10] We are unwilling to go beyond the intent of the legislature in providing a private remedy under the statute. Because the Act may not be used to create a duty in a private cause of action, the trial court properly granted summary judgment on this issue.

### B. Assumption of Duty

▮▮▮▮▮ Vaughn next argues that Daniels assumed a duty to Vaughn. Indiana law provides that a duty may be "created by gratuitous or voluntary assumption." *Gunter v. Village Pub*, 606 N.E.2d 1310, 1312 (Ind.Ct.App.1993). The assumption of a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person. *Delta Tau Delta v. John-*

---

**10.** We observe in any event that an MHSA inspection conducted after the accident resulted in no citations or sanctions relating to the safety of the sump.

*son,* 712 N.E.2d 968, 975 (Ind.1999). Whether a party has assumed a duty and the extent of that duty, if any, are questions for the trier of fact. *Id.* However, a court may decide the issue as a matter of law when the record contains insufficient evidence to establish such a duty. *Id.*

Vaughn relies on *Plan–Tec v. Wiggins,* 443 N.E.2d 1212 (Ind.Ct.App.1983), in support of his position that a general contractor who assumes a duty and is negligent in performance of that duty is liable. In *Plan–Tec,* the evidence showed that there was a safety director on site who inspected scaffolding each morning and initiated weekly safety meetings and directed that certain safety precautions, including building guard rails around floor openings and wearing hard hats in work areas, were taken by contractors. We held that a jury could reasonably have concluded that Plan–Tec undertook to perform certain safety-related duties, but failed to perform them adequately. *Id.* at 1221.

We have considered what evidence is sufficient to establish an assumption of a duty in several other cases. For example, in *Perry v. Northern Indiana Public Service Co.,* 433 N.E.2d 44 (Ind.Ct.App.1982), an employee of a sub-contractor fell while attempting to weld a fan housing approximately twenty feet above the ground without scaffolding or other safety apparatus. During the project, the property owner held regular safety meetings for employees of sub-contractors, had from "6 to 25 to 30 safety men" at the site who had "jurisdiction" of the safety program, and employed a "Safety Supervisor" to whom the injured employee had complained prior to his fall. *Id.* at 49–50. We held that there was a factual dispute regarding the defendant's assumption of a duty to the injured employee sufficient to preclude summary judgment. *Id.* at 50.

In *Phillips v. United Engineers & Constructors. Inc.,* 500 N.E.2d 1265 (Ind.Ct. App.1986), a contractor's employee was fatally injured when he fell from an elevated catwalk where he had been installing sheet metal siding. The construction manager hired by the landowner had a safety coordinator who held bi-weekly safety meetings for superintendents of the contractors. He also conducted tours of the jobsite during which he noted safety violations or unsafe practices, and then wrote a "speed letter" advising the violator to remedy the problem. *Id.* at 1269. The safety coordinator admitted that a portion of his responsibility was to "govern the safety of contractors." *Id.* We concluded that this evidence was sufficient to present a jury question regarding whether the construction manager had assumed a duty for the overall safety of the projects. *Id.*

In *Teitge v. Remy Construction, Co.,* 526 N.E.2d 1008 (Ind.Ct.App.1988), the employee of the general contractor was injured when he fell through an unguarded skylight as he was walking backward, dragging a piece of metal across the roof. The employee claimed the architect had voluntarily assumed a duty to protect the safety of all employees on the construction site. The architect's project administrator and supervisor conducted on-site progress and coordination meetings every two weeks as well as daily on-site inspections to verify compliance with the contract and to coordinate the work. On two occasions, the supervisor had instructed employees to observe certain obvious safety practices. We held that there was insufficient evidence to present a jury question on whether the architect had assumed a duty to the employee. *Id.* at 1015.

In *Ozinga Transportation Systems, Inc. v. Michigan Ash Sales, Inc.,* 676 N.E.2d 379 (Ind.Ct.App.1997), *trans. de-*

*nied,* we determined as a matter of law that a subcontractor's assumption of safety responsibilities may supersede any duty of a general contractor, even if the general contractor contractually agreed to take responsibility for safety. *Id.* at 384. The plaintiff was an employee of the subcontractor who was asked to remove fly ash from a power generating station and was injured when he fell. The contract between the contractor and the company required it to "clean up all spillage on [company] property caused by [contractor] personnel or equipment ... tarp all trucks to minimize fugitive dust emissions in transport ... and maintain all roads in a dust free condition." *Id.* at 383. Under the contractor's agreement with the subcontractor, the subcontractor was to "provide cleanup of any spills from truck or ash conditioner and prevent any plug up of equipment." *Id.* at 384. We held that "[t]he plain and clear language of the contracts together with the other designated materials reveal that ultimately [the subcontractor] had control and possession of the fly ash on the day of the accident and had contractually assumed the duty to remove the fly ash from [the company's] premises and clean-up any spillage in the process." *Id.* at 384.

In *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258 (Ind.Ct.App.2002), an employee of a roofing company sued Knauf for injuries sustained after he fell through a skylight while repairing Knauf's roof. We found that Knauf did not assume a duty to the employee. *Id.* In so holding, we noted that Knauf reviewed house rules of safety with the roofing company before the project, but that it did not hire a safety director for the project and did not conduct regular safety meetings during the project. *Id.* Knauf merely reminded workers to avoid the skylights and may have occasionally visited the site during the repairs. *Id.*

■■■ After reviewing the designated evidence, we find that the facts before us are similar to those in *Teitge, Ozinga,* and *Knauf.* Here, Vaughn argues that Daniels' Health and Safety Policy established a question of fact regarding its assumption of duty for the design safety of the construction site, particularly language in the policy that states, "Handrail, mid-rail, and toe boards must be used." Appellant's App. p. 202. Vaughn also points to the daily field reports completed by Daniels.

However, the uncontradicted designated evidence was that Trimble, not Daniels, was responsible for carrying out duties on site and directing the work of Vaughn. Vaughn did not designate any evidence establishing that Daniels gave instructions to Vaughn, undertook safety measures at the work site, or gave safety directives to Trimble or Vaughn with respect to the plant or the sump. The Safety Policy designated by Vaughn does require Daniels' employees to conduct daily, weekly, and periodic inspections and to complete certain forms pertaining to those inspections. However, Vaughn does not designate any evidence establishing that the Safety Policy was being used on this project or that Daniels was following its terms during the construction of this plant.[11]

---

11. The lengthy document is titled "Daniels' Health and Safety Policy," the purpose of which is "to provide safety information for the design, construction, operation, and maintenance of The Daniels Co.'s preparation facilities." Appellant's App. p. 200. The document does not specify if it is in effect on all of Daniels' jobs and the extent to which it is to be implemented when subcontractors are involved. Thus, it was Vaughn's burden as the proponent of the evidence to establish that the policy was in effect during the construction of this plant.

Although Vaughn designated a significant number of daily field reports completed by Daniels' supervisors, those reports only reference weather conditions, the number of employees, and issues pertaining to materials and progress on the construction. There is no indication that Daniels' employees conducted safety inspections prior to completing the forms, and there are no notations relating to safety concerns. On the day of Vaughn's fall, a notation was made that said, "Had one of Trimble Pipe fitters hurt today. Chain on pipe slided and knock him off the heavy media sump, he was hurt bad." Appellant's App. p. 613. The report also has a notation that the site would probably be inspected by MSHA the next day as a result of the accident. Contrary to Vaughn's characterization of it, this notation does not in and of itself create an issue of fact concerning whether Daniels assumed a duty. The field report merely documented the fall; it did not suggest that Daniels was in any way responsible for safety during construction.

In sum, the designated evidence failed to demonstrate Daniels exercised the level of activity that would constitute "a deliberate attempt to control or actively supervise safety at the job site." *Robinson v. Kinnick*, 548 N.E.2d 1167, 1169 (Ind.Ct.App. 1989), *trans. denied.* Accordingly, we conclude that the evidence is insufficient as a matter of law to establish a legal duty by virtue of Daniels' affirmative acts. The trial court properly entered summary judgment on this issue.

**12.** Daniels also challenges the admissibility and relevance of the "Design, Procurement, and Construction Specification" on the basis that Vaughn failed to establish that the Specification governed Daniels' duty on site. Vaughn responds that Daniels produced the document during discovery and thus a suffi-

## C. Contractual Duty

Vaughn next maintains that Daniels and Solar owed a contractual duty to him. He cites to the "Design, Procurement, and Construction Specification" dated January 27, 1995, which indicates that Daniels was responsible for the design of the Cannelburg Project. Vaughn also relies upon MacCollum's affidavit, which opines that Daniels failed to use reasonable care by not having a construction management plan and/or a process of plant assembly plan for the design of the Cannelburg Project. The affidavit posits that without such a plan, Daniels had an unsafe design, which relied upon manhandling heavy and long pipe components, resulting in a "foreseeable proximate injury" to Vaughn. Appellant's App. p. 546.

The parties agree that although there was no written contract between Daniels and Solar, there was an implied contract between them. Vaughn argues that the terms and conditions of the implied contract as they relate to the construction site and to Solar's responsibilities and involvement are questions of fact for the jury to decide. In response, Daniels argues it designated evidence demonstrating that Trimble was responsible for maintaining a safe workplace, claiming that Vaughn has failed to designate any admissible evidence to rebut that designated by Daniels.[12]

■■■■ The contract between Daniels and Trimble provided that Trimble agreed to comply with Daniels' safety policies and conduct weekly safety meetings. The contract further provided:

cient foundation was laid for it. We need not specifically address this question given our conclusion that even if it is considered as designated evidence, there is no genuine issue of fact relating to the contractual duty of Daniels and Solar.

The Subcontractor (including its employees, servants or agents) shall conduct its operations so as to conform to all applicable state, federal and local statutes, laws, ordinances and regulations pertaining to the safety and health of the public and its employees (including, but not limited to, the Federal Mine Health and Safety Act of 1977, as amended) and agrees to indemnify and save harmless Owner and Contractor for and against any consequences and all monetary losses, including attorney's fees and court costs, due to the failure of the Subcontractor to abide by any of the said statutes, laws, ordinances, and regulations.

Appellant's App. p. 438. Trimble had control and possession of the work site at the time of the incident and had agreed to be responsible for implementing and carrying out all safety policies and procedures and being informed of and complying with all applicable laws and regulations affecting the plant. Thus, any duties that Daniels had relating to safety arising from its implied contract with Solar were effectively transferred to Trimble in the written contract. Vaughn has designated nothing to raise an issue of fact in this regard.

 Similarly, Vaughn has failed to demonstrate an issue of fact relating to Solar's duty as a landowner. The designated evidence established that Trimble contracted with Daniels to implement, comply with, and carry out all safety policies and procedures, applicable laws, regulations, orders, and legal restrictions. It further established that Trimble employees controlled the construction site and that no Solar employees, agents, or officers were present or involved in the work being performed by Vaughn at the time of his injury. The evidence also established that there were no safety meetings conducted by Solar involving Trimble employees. Indiana cases have uniformly held

that where an instrumentality causing injury was in the control of an independent contractor, a duty will not be found where there is no evidence that the landowner maintained any control over the "manner or means" by which the contractor engaged in its work. *See, e.g., Bethlehem Steel Corp. v. Lohman,* 661 N.E.2d 554, 556 (Ind.Ct.App.1995). Therefore, the evidence is insufficient as a matter of law to establish a contractual duty on the part of Solar.

## Conclusion

We hold that the portions of MacCollum's affidavit specified above should be stricken. We reverse the trial court's order to the extent it concluded that Vaughn was not a "user or consumer" pursuant to the Act, that the product was not unreasonably dangerous, that Vaughn misused the product, and that Vaughn incurred the risk. Summary judgment was not appropriate on those issues. We affirm the entry of summary judgment on the remaining issues. In essence, we reinstate Vaughn's product liability claim against Daniels but not the negligence claims against Daniels and Solar. We remand for the case to proceed consistently with this opinion.

Affirmed in part, reversed in part, and remanded.

VAIDIK, J., concurs.

BROOK, C.J., concurs in part and dissents in part, with opinion.

BROOK, Chief Judge, concurring as to issue V and dissenting as to issues I, II, III, and IV.

I concur with the majority's conclusion under issue V that Daniels and Solar neither owed nor assumed a duty to Vaughn under a common-law negligence theory. However, I respectfully dissent from the

majority's conclusion that Vaughn may proceed against Daniels and Solar under the Indiana Products Liability Act. In my view, Vaughn cannot recover under the Act for the simple reason that he is not a "user" or "consumer" of a product. I would therefore affirm the trial court's grant of Daniels's and Solar's motions for summary judgment on Vaughn's claims under the Act.

For purposes of the Act, Indiana Code Section 34–6–2–29 defines "consumer" as:

(1) a purchaser;

(2) any individual who uses or consumes the product;

(3) any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question; or

(4) any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

See also Ind.Code § 34–6–2–147 (providing that " '[u]ser', for purposes of [the Act], has the same meaning as the term 'consumer', which is set forth in section 29 of this chapter"). Clearly, Vaughn does not fit within definitions one, three, or four. As the majority notes, he may recover under the Act only if he is an "individual who [was] us[ing] . . . the product[.]" Op. at 1124. The majority relies on our supreme court's statement in *Stegemoller* that

"maintenance may be part of a product's reasonably expected use"[13] in concluding that "[i]t is a logical extension of the supreme court's analysis to include in the definition of user or consumer a person who is injured while installing a product[.]" Op. at 1127. While I agree that current precedent supports the conclusion that maintenance of a product may be part of that product's "reasonably expected use" under certain limited circumstances, it simply does not follow that *installation* of the product itself, without more, confers "user" status on the individual performing the installation.

The verb "use" may be defined as "[t]o employ or make use of (an article, etc.), esp[ecially] for a profitable end or purpose[.]" THE COMPACT OXFORD ENGLISH DICTIONARY 2204 (J.A. Simpson & E.S.C. Weiner, eds., 2nd ed.1991). The verb "install" may be defined as "[t]o place (an apparatus, a system of ventilation, lighting, heating, or the like) in position for service or use[.]" *Id.* at 857. Quite simply, installation of a product occurs *before use of the product has even begun* and therefore cannot be part of a product's use. Consequently, one who installs a product cannot be a user under the Act.

In the instant case, the coal sump's reasonably expected use was to separate certain materials generated in the coal mining

---

**13.** The *Stegemoller* court, in turn, cited to *Butler* for this proposition. The holding in *Stegemoller* was not, in fact, based on maintenance of the product. Rather, it was based on the plaintiff's bystander status under Indiana Code Section 34–6–2–29(4), *see Stegemoller,* 767 N.E.2d at 974, and our supreme court's underlying conclusion that "[t]he normal and expected use of asbestos products entails contact with its migrating and potentially harmful residue." *Id.* at 976.

It is also worth noting that the *Butler* court's conclusion that Butler could seek recovery under the Act was not based on the

fact that he was performing maintenance on a product but rather on the fact that he was an employee of the "consuming entity[.]" *See Butler,* 733 N.E.2d at 919 ("As an employee of the 'consuming entity,' Butler falls under the definition of 'user or consumer[.]' "). In summary, our supreme court has never held that maintenance by itself can be considered part of a product's use. Current precedent holds only that a person injured while performing maintenance on a product can recover under the Act if he is an employee of the consuming entity.

process, and it had not yet been put to that use when Vaughn was injured. Therefore, Vaughn could not possibly have been an "individual who [was] us[ing] ... the product[.]" Ind.Code § 34–6–2–29(2).[14] I would hold on that ground that Vaughn cannot maintain an action against Solar or Daniels under the Act and would therefore affirm the trial court's judgment in all respects.

**14.** The majority distinguishes the instant case from *Thiele*, 489 N.E.2d 562. In that case, a panel of this court held that the phrase " 'user or consumer' ... does not include intermediaries in the distributive chain" and that "it appears our legislature has required a 'sale' to a 'first consuming entity' before the protection afforded by the Act is triggered[.]" *Id.* at 588. I agree with the majority that *Thiele* is factually distinguishable from the instant case, in that the *Thiele* court addressed the status of an intermediary in the product's distribution chain while we address the status of a person installing a product after its sale to the first consuming entity.

In my view, the *Thiele* court interpreted the plain language of Indiana Code Section 34–6–2–29 too narrowly. As previously mentioned, Section 34–6–2–29 recognizes four general types of consumers: purchasers, individuals who use or consume the product, persons who are in possession and control of the product while acting for or on behalf of the injured party, and bystanders. Only under the first category is a person a "consumer" by virtue of a sale; I cannot see that any sale is required under the other categories. I believe that the *Thiele* court was incorrect in concluding that Thiele was not a user or consumer because there had been no sale to a first consuming entity. In my view, Thiele could not seek recovery under the Act for precisely the same reason that Vaughn should not be able to: the handling of cases of soda within a warehouse, like the installation of a coal sump, is not part of a product's use.