**BUILDING MATERIALS MANUFAC-TURING CORPORATION d/b/a GAF Materials Corporation, Appellant–Plaintiff,**

v.

**T & B STRUCTURAL SYSTEMS, INC., Appellee–Defendant.**

**No. 46A03–0307–CV–268.**

Court of Appeals of Indiana.

March 9, 2004.

Randall J. Nye, Beckman, Kelly & Smith, Hammond, IN, Terry M. Hackett, Michael A. Nicolas, Gardner Carton & Douglas LLP, Chicago, IL, Attorneys for Appellant.

Thomas M. Greenberg, Thomas M. Greenberg Prof. Corp., Merrillville, IN, Attorney for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Plaintiff Building Materials Manufacturing Corporation d/b/a/ GAF Materials Corporation ("GAFMC") appeals the trial court's grant of summary judgment to Appellee–Defendant T & B Structural Systems, Incorporated, ("TBSS") on Count III of GAFMC's complaint, alleging negligence. We affirm.[1]

### Issue

GAFMC raises three issues, one of which we find dispositive: Whether the trial court erroneously granted summary judgment to TBSS on GAFMC's complaint for negligence because a genuine issue of material fact exists regarding whether TBSS assumed a duty of care to GAFMC by rendering advice.[2]

### Facts and Procedural History

The relevant facts are undisputed. In April of 1999, GAFMC purchased real property located at 505 N. Roeske Avenue, Michigan City, Indiana ("Property"), which contained a manufacturing facility. At the time of the purchase, GAFMC intended to

---

1. We hereby deny GAFMC's motion for oral argument.

2. GAFMC also raised the following issues, which we do not address because of our disposition of the first: (1) whether the terms and conditions of the purchase order between TBSS and Contractor shield TBSS from negligence liability; and (2) whether the terms and conditions of the purchase order between TBSS and Contractor apply to GAFMC.

relocate certain equipment to the Property to enable it to manufacture roofing shingles on the Property (referred to as the "Midwest Plant Relocation Project"). On November 25, 1998, GAFMC executed an engineering contract with Apex Engineering Incorporated ("Apex") for the performance of "any and all necessary engineering, design, and drafting services for [GAFMC's] Mid–West Plant Relocation project," including the construction of a railroad spur line with an earthen embankment and a retaining wall. Appellant's App. at 18. On May 20, 1999, GAFMC entered into a construction contract with Tonn and Blank Construction ("Contractor"). Pursuant to the construction contract, Contractor was responsible for furnishing "all necessary management, labor, materials, tools, equipment and supervision to perform the civil construction work ... at GAFMC's Michigan City, Indiana Plant." *Id.* at 358.

Subsequently, and as part of the Midwest Plant Relocation Project, GAFMC and Contractor executed an additional contract ("Railroad Earthwork Contract") for the construction of a railroad spur line, which would aid in transporting roofing shingles and other materials to and from the Property. In the Railroad Earthwork Contract, Contractor agreed to "furnish all necessary management, labor, materials, tools, equipment and supervision to perform the [Railroad Earthwork Contract] ... at GAFMC's Michigan City, Indiana plant." *Id.* at 399.

On July 29, 1999, Apex requested a bid from TBSS for the sale and purchase of a Wire Wall for use in the construction of a retaining wall as part of the railroad earthwork project. In response, TBSS submitted its quotation for the provision of approximately 7,769 square feet of Wire Wall at a purchase price of $54,383.00. TBSS's

quotation incorporated by reference the following terms and conditions:

*Responsibilities*

The buyer will abide by the terms of this agreement. This is a Purchase Order for the supply of Materials. Any engineering or technical services provided are incidental to the supply of such materials. To the extent [TBSS] participates in the selection of the Materials to be provided, [TBSS] relies entirely on the drawings, specifications, and survey data provided by the Owner and the Buyer. [TBSS] has not performed any independent investigation of the Project conditions. [TBSS's] material selection relates only to the internal stability of the structure for which its Materials are used. [TBSS] is not responsible for the overall stability of the foundation soils below or behind the Structure, nor any slip surface external to the Structure.

*Limitation of Liabilities*

[TBSS's] liability for any breach of the terms of this Purchase Order, including late delivery or warranty, shall not exceed the Purchase Order Amount. In no event shall [TBSS] be liable for incidental, consequential, or liquidated damages.

\* \* \* \* \*

*Technical Assistance*

[TBSS] will provide a qualified technical assistant to aid in the beginning of wall construction as well as periodic monitoring during the construction phase for a period of time not to exceed five days. This will not relieve the buyer of any responsibility to construct the retaining wall according to contract specifications and [TBSS's] recommendations. . . .

*Id.* at 137–38. TBSS's quotation also contained a clause that "[b]y signing the accepted [sic] will enact this material quote as a legal purchase agreement." *Id.* at 137. On September 21, 1999, Contractor accepted TBSS's quotation and, in so doing, executed the Purchase Order.

On or about October 21, 1999, TBSS shipped the Wire Wall to Contractor. Subcontractor Rieth–Riley Construction Company, Incorporated ("Rieth–Riley") constructed the retaining wall foundation. Shortly thereafter, "the foundation began severely 'pumping' water and other material when being proof rolled by Rieth–Riley." *Id.* at 394. Apex's Construction Manager, Jimmy Jay Wood ("Wood"), was responsible for overseeing all work performed by contractors and subcontractors on the Midwest Plant Relocation Project. When Wood noticed that the foundation was pumping water, he advised Apex's Project Manager, Dan McNamara ("McNamara") of the problem and was told to "stop work on the foundation until [McNamara] was able to find a 'fix' or solution for the 'pumping.'" *Id.* at 394–95. Wood also contacted the president of TBSS, Thomas P. Taylor ("Taylor"), to advise him of the "pumping" and sent him digital photographs of the "pumping." *Id.* at 395. Subsequently, Rieth–Riley successfully stopped the "pumping" by over-excavating the foundation of the earthen embankment and the retaining wall and by replacing "it with a geogrid reinforced rock base." *Id.* at 395.

Rieth–Riley then constructed the retaining wall using the Wire Wall supplied by TBSS. During construction, the retaining wall and the earthen embankment began to settle. When Wood discovered the settling, he immediately contacted TBSS, via Taylor, and advised it of the settling.

Wood also sent Taylor digital photographs of the settling. In response, Taylor informed Wood that "it was normal for the wall and the ground beneath it to settle and advised [Wood] to put additional backfill (or keep a static load) on the earthen embankment behind the retaining wall." *Id.* at 395. However, no employee of TBSS visited the worksite. Wood then instructed Rieth–Riley "to place additional backfill on the earthen embankment behind the retaining wall." *Id.*

Approximately one month later, a section of the retaining wall failed, causing backfill and other materials to pour through the retaining wall and into areas surrounding the retaining wall, including wetlands. Wood instructed Rieth–Riley to stop work on the retaining wall. Wood next sent digital photographs of the retaining wall to TBSS. In addition, Wood telephoned Taylor to discuss the failure of the retaining wall. At this point, Taylor advised Wood to consult a soil engineer to examine the subsoil beneath the retaining wall and the earthen embankment and to take "soil borings of the sub-soil." *Id.* In the meantime, Taylor told Wood to continue placing additional backfill on the earthen embankment to achieve settlement.

Subsequently, TBSS discovered that "the sole reason for the failure of the retaining wall and earthen embankment was that the subsoil foundation was insufficiently stable, due to the presence of a subsoil layer of peat." *Id.* at 132. Accordingly, the Wire Wall was not defective and the earthen embankment would not have failed but for insufficient stability of the subsoil foundation.

On November 20, 2000, GAFMC filed a complaint against Apex, Contractor, and TBSS, alleging breach of contract (against Apex and Contractor only) and negli-

gence.[3] On September 3, 2002, TBSS filed a motion for summary judgment, which the trial court granted after conducting a hearing. In so doing, the trial court expressly found that "there is no just reason for delay" and ordered that judgment be entered in favor of TBSS and against GAFMC. It is from this summary judgment order that GAFMC now appeals.[4]

## Discussion and Decision

### I. Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties

for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997).

### II. Analysis

■ On appeal, GAFMC argues that the trial court erred by granting summary judgment to TBSS on the negligence claim because there is a genuine issue of material fact regarding whether TBSS assumed a duty of care to GAFMC. It is important to note that, for its negligence claim against TBSS, GAFMC does not allege breach of a contractual duty, as there appears to be none, nor that the Wire Wall itself was defective or dangerous. Rather, GAFMC's sole contention is that TBSS assumed a duty to GAFMC when it advised Wood that the settling of the retaining wall was normal and to continue putting backfill on the foundation.[5]

---

3. For purposes of our analysis, Apex and Contractor are not parties to this appeal.

4. TBSS filed a motion to strike requesting that portions of GAFMC's reply brief that refer to the professional negligence doctrine be stricken because they were not part of the original appellate brief and are, thus, inappropriate. Ind. Appellate Rule 42 provides, in pertinent part, that:

Upon motion made by a party within the time to respond to a document, or if there is no response permitted, within thirty (30) days after the service of the document upon it, or at any time upon the court's own motion, the court may order stricken from

any document any redundant, immaterial, impertinent, scandalous or other inappropriate matter.

We now grant TBSS's motion to strike certain portions of the reply brief because the material is inappropriate. In addition, we observe that our disposition of this cause of action does not depend or rely upon the professional negligence doctrine.

5. TBSS also relies upon *Darst v. Illinois Farmers Ins. Co.*, 716 N.E.2d 579, 584 (Ind. Ct.App.1999), to support its argument that GAFMC's assumption of duty claim is not actionable under Indiana law, but rather, merely a claim for negligent misrepresentation cloaked under a different name. We find

■ To effectively assert a negligence claim, GAFMC must establish that: (1) TBSS had a duty to exercise reasonable care under the circumstances; (2) TBSS breached that duty; and (3) GAFMC incurred damages as a proximate result of TBSS's breach of duty. *See Ind. State Police v. Don's Guns & Galleries,* 674 N.E.2d 565, 568 (Ind.Ct.App.1996). Absent a duty, there can be no breach and, therefore, no recovery for the plaintiff in a negligence cause of action. *Vaughn v. Daniels Co. (West Virginia), Inc.,* 777 N.E.2d 1110, 1133 (Ind.Ct.App.2002). The existence of a duty is a pure question of law for the court to determine. *Id.* Factual questions, however, may be interwoven in the issue of duty, rendering the existence of a duty a mixed question of law and fact to be determined by the fact-finder. *Id.*

■ Here, as part of its negligence claim, GAFMC argues that TBSS assumed a duty of reasonable care to GAFMC when it assured Woods that the settling of the earthen embankment and retaining wall was normal and advised Woods to put additional backfill on the earthen embankment behind the retaining wall. Indiana law provides that a duty may be "created by gratuitous or voluntary assumption." *Gunter v. Village Pub,* 606 N.E.2d 1310, 1312 (Ind.Ct.App.1993). The assumption of a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person. *Vaughn,* 777 N.E.2d at 1136. Whether a party assumed a duty and the extent of that duty are questions for the fact-finder.[6] *Gunter,* 606 N.E.2d at 1312. However, a court may decide the issue as a matter of law when the record contains insufficient evidence to establish such a duty. *Vaughn,* 777 N.E.2d at 1136.

Several Indiana cases have considered what evidence is sufficient to establish an assumption of a duty. *Id.* In *Vaughn,* for example, the buyer contracted with the defendant to design, procure, and construct a coal preparation plant. *Id.* at 1116. The defendant then subcontracted with a third company for the actual construction of the plant, including the assembly of three coal sumps. *Id.* The defendant prepared the blueprints for the coal

this argument unpersuasive because, here, GAFMC is not asserting an independent cause of action for "assumption of duty" or "negligent misrepresentation." Instead, GAFMC is alleging a negligence cause of action, wherein it seeks to establish the duty by invoking the assumption of duty doctrine.

Moreover, in *Darst,* an insured sought an opinion from his insurance company regarding the fairness of a settlement amount from another insurance company. After discovering that the settlement amount was not appropriate, the trustee in bankruptcy of the insured filed suit against the insured's insurance company. The *Darst* court determined that the insured had no right to rely upon the representation by the insurance company that the offer was fair because such representation was merely an opinion and not a statement of fact. In the instant case, TBSS's advice amounted to more than just opinion and, thus, *Darst* is distinguishable.

6. We note that the Restatement (Second) of Torts Section 324A, entitled "Liability to Third Person for Negligent Performance of Undertaking," applies if a party assumes a duty and provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*See generally Sports, Inc. v. Gilbert,* 431 N.E.2d 534, 536–37 (Ind.Ct.App.1982).

sumps. *Id.* The plaintiff, an employee of the subcontractor, was injured while working on one of the coal sumps. *Id.* The plaintiff filed a complaint against the defendant alleging that the defendant assumed a duty to ensure the design safety of the construction site by establishing a health and safety policy, which provided that: "Handrail, mid-rail, and toe boards must be used." *Id.* at 1137. Another panel of this court held that, because the designated evidence failed to demonstrate a deliberate attempt to control or actively supervise safety at the job site on the part of the defendant, the evidence was insufficient as a matter of law to establish a legal duty by virtue of the defendant's affirmative acts. *Id.* at 1138.

By contrast, in *Perry v. N. Ind. Pub. Serv. Co.*, 433 N.E.2d 44 (Ind.Ct.App.1982), an employee of a subcontractor fell while attempting to weld a fan housing approximately twenty feet above the ground without scaffolding or other safety apparatus. During the project, the property owner held regular safety meetings for employees of subcontractors, had between "6 to 25 to 30 safety men" at the site who had "jurisdiction" of the safety program, and employed a "Safety Supervisor" to whom the injured employee had complained prior to his fall. *Id.* at 49–50. We held that there was a factual dispute regarding the defendant's assumption of a duty to the injured employee sufficient to preclude summary judgment. *Id.* at 50.

We find the present case to be more factually similar to *Vaughn* than *Perry*. The record before us reveals that TBSS provided a Wire Wall for use in the construction of the retaining wall as part of the railroad earthwork project. The purchase order for the Wire Wall provides, in pertinent part, as follows:

*Responsibilities*

The buyer will abide by the terms of this agreement. This is a Purchase Order for the supply of Materials. Any engineering or technical services provided are incidental to the supply of such materials. To the extent [TBSS] participates in the selection of the Materials to be provided, [TBSS] relies entirely on the drawings, specifications, and survey data provided by the Owner and the Buyer. [TBSS] has not performed any independent investigation of the Project conditions. [TBSS's] material selection relates only to the internal stability of the structure for which its Materials are used. [TBSS] is not responsible for the overall stability of the foundation soils below or behind the Structure, nor any slip surface external to the Structure.

Appellant's App. at 138. The record further demonstrates that, during construction of the retaining wall, the retaining wall and the earthen embankment began to settle. When Wood discovered the settling, he immediately contacted TBSS, via Taylor, and advised it of the settling. Wood also sent Taylor digital photographs of the settling. In response, and without visiting the worksite, Taylor informed Wood that "it was normal for the wall and the ground beneath it to settle and advised [Wood] to put additional backfill (or keep a static load) on the earthen embankment behind the retaining wall." Appellant's App. at 395. Wood then instructed Rieth–Riley "to place additional backfill on the earthen embankment behind the retaining wall." *Id.* Approximately one month later, a section of the retaining wall failed, causing backfill and other materials to pour through the retaining wall and into areas surrounding the retaining wall, including wetlands. This time when Wood telephoned Taylor to discuss the failure of the retaining wall, Taylor advised Wood to

consult a soil engineer to examine the sub-soil beneath the retaining wall and the earthen embankment and to take "soil borings of the sub-soil." *Id.* In the meantime, Taylor told Wood to continue placing additional backfill on the earthen embankment to achieve settlement.

This evidence is insufficient to create a genuine issue of material fact regarding whether TBSS assumed a duty of reasonable care to GAFMC, the extent of such duty, and whether the duty was breached. As such, we determine that, as a matter of law, the record contains insufficient evidence to establish a duty. Absent a duty, GAFMC may not maintain a negligence action against TBSS. Accordingly, the trial court properly granted summary judgment to TBSS.

For the foregoing reasons, we affirm the trial court's grant of summary judgment to TBSS.

Affirmed.

RILEY, J., and DARDEN, J., concur.